{¶ 1} Defendant-Appellant, Charles J. Cromes, appeals the judgment of the Sidney Municipal Court denying his motion to suppress all evidence relating to the charges brought against him after a traffic stop. On appeal, Cromes argues that the trial court erred in finding that the arresting officer made a valid investigatory stop; that the trial court erred in finding that the arresting officer had justification to continue to detain him after the purpose of the original stop was completed; that the trial court erred in not permitting him to cross-examine the arresting officer as to the details of his operation of his vehicle prior to the traffic stop and as to whether his license plate was properly displayed; and, that the trial court improperly placed the burden of proof on him. Finding that the arresting officer made a valid investigatory stop, which became void during the arresting officer's approach to Cromes' vehicle when he realized that he had incorrectly entered Cromes' license plate number, and that the arresting officer did not form a new reasonable, articulable suspicion to continue to detain Cromes, we find that the motion to suppress should have been granted and reverse the judgment of the trial court.
 {¶ 2} In November of 2005, Cromes was charged with operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a) and (d), both misdemeanors of the first degree. Cromes pled not guilty to both charges.
 {¶ 3} In January of 2006, Cromes filed a motion to suppress all evidence relating to the violations of R.C. 4511.19.
 {¶ 4} In February of 2006, the trial court held a hearing on Cromes' motion to suppress. At the suppression hearing, the following testimony was presented:
 {¶ 5} The State's first witness was Officer Scott White, a patrol officer with the Sidney Police Department. Officer White testified that on November 2, 2005, he stopped Cromes "[o]n Fair Road near Highland Avenue" (tr. p. 7) in Sidney, Ohio, while he was driving a Ford vehicle. Officer White stated that while he was driving approximately sixty feet behind Cromes, he read Cromes' license plate number as CKW 1220. Officer White continued that Cromes' license plate "was difficult to read due to either some dirt or manufacturer defect" and that he did not recall the closest that he got to Cromes's vehicle while attempting to read the license plates. (Tr. p. 8). Officer White also noted that he ran a check on the license plate "Ohio [CKW] 1220", which returned a female owner with her driver's license under suspension and "showed that the plate belonged on a Subaru." (Tr. p. 9). Officer White testified that he decided to stop Cromes' vehicle for three reasons. Specifically, Officer White noted that he stopped Cromes' vehicle because "[t]he plate was difficult to read which would be failure to display, improper display. It showed that * * * the registered owner of that license plate was under suspension and that * * * it would be improper display or fictitious plates because it was on the wrong vehicle." (Tr. p. 9).
 {¶ 6} Officer White continued that after he stopped and "[a]s [he] approached the vehicle, [he] realized that the plate was actually [CKW] 1320." (Tr. p. 10). Officer White also affirmed that the license plate was one number off from the one that he had run. Officer White also noted that he realized that he had made a mistake when he was approximately ten feet from the vehicle.
 {¶ 7} Officer White testified that at this point, he "called dispatch, advised them of the correct plate [and] then approached the driver to discuss the improper display." (Tr. p. 10). Officer White continued that he advised Cromes that his license plate was difficult to read. Officer White further noted that he "observed some open containers in the passenger's seat * * * of the motor vehicle" (tr. p. 10) and that he "observed that [Cromes'] eyes were bloodshot and glassy." (Tr. p. 11). Officer White testified that he then shifted his investigation to an OVI investigation.
 {¶ 8} On cross-examination, Officer White did not disagree that he followed Cromes' vehicle for 1.3 miles. Cromes' counsel also attempted to cross-examine Officer White regarding Cromes' driving prior to the traffic stop; however, the State objected arguing that Cromes' driving was irrelevant and stipulated that there was no erratic driving on the part of Cromes. Cromes' counsel later proffered evidence about the 1.3 miles that Officer White followed Cromes. Officer White also testified that when he stopped Cromes, he stopped his cruiser approximately twenty feet behind Cromes' vehicle. Officer White continued that he left his cruiser and began to approach Cromes' vehicle. Officer White confirmed that when he was approaching Cromes' vehicle, he observed that the license plate read "CKW 1320" (tr. p. 18), that Cromes was not the driver that was identified as being under suspension, and that the Subaru that he identified had nothing to do with the license plate CKW 1320. Officer White agreed that after making this observation, he then proceeded to Mr. Cromes while still deciding "whether I was going to cite him or give him a warning for improper display." (Tr. p. 24). Officer White testified that he then spoke with Cromes and informed him that he was going to run his license plate. Officer White continued that he also observed beer bottles in Cromes' car at this point and then went back to his cruiser to run Cromes' license plate. Officer White confirmed that after he ran license plate CKW 1320, he found out that the license plates were valid and matched the vehicle Cromes was driving. Officer White also stated that at this time, he observed beer bottles in Cromes' vehicle.
 {¶ 9} Officer White agreed that there was no problem with the illumination of Cromes' license plate. Officer White also testified that "[he] couldn't tell" whether Cromes' license plates had a problem with either dirt or manufacturer defect. Officer White continued that after he approached Cromes' vehicle and looked at the license plate, he noticed that there was no dirt or mud on Cromes' license plate covering the lettering or numbering. Officer White also admitted that there was nothing obstructing Cromes' license plate; that the license plate was located where it was supposed to be located on Cromes' vehicle; that the license plate had the proper registration information on it; that the vehicle had the proper stickers; and, that there was no paint on the license plate to obscure its numbers. Officer White also testified that he did not cite Cromes for improper display of license plates and that he did not take a photo of Cromes' license plate on the night Cromes was stopped.
 {¶ 10} Officer White also confirmed that according to his narrative, the first time he approached Cromes to inform him that he was going to run his license plates, he did not state that he smelled any alcohol. Officer White continued that he believed that "[he] incorrectly wrote [his] narrative" noting that "the time element is incorrect as far as when [he] ran the plate and when [he] detected the odor of alcoholic beverage." (Tr. p. 29). Officer White then testified that he did notice alcohol when he first spoke to Cromes and that he did not make mention of this to Cromes, ask if Cromes had been drinking, or ask Cromes to step out of the car to conduct an OVI examination.
 {¶ 11} Officer White also admitted that during his earlier testimony, he did not mention that he approached Cromes' vehicle on two separate occasions. Officer White also confirmed that his narrative did not provide that he approached Cromes' vehicle on two separate occasions and did not provide that he smelled alcohol on Cromes during the first occasion he met Cromes. Officer White also noted that his narrative provided that after he ran the information and came back to Cromes' vehicle, he then smelled alcohol on Cromes and asked Cromes questions about whether he had been drinking.
 {¶ 12} On redirect examination, Officer White believed that he warned Cromes that he should properly display his plates "at the station after the intoxilyer (Sic.) test." (Tr. p. 28). Officer White also confirmed that he was "still investigating the failure to display license plates", when he smelled the odor of alcohol on Cromes. (Tr. p. 28).
 {¶ 13} On recross-examination, Officer White admitted that he did not mention in his narrative that he was investigating Cromes for the improper display of plates, but that he should have in his narrative.
 {¶ 14} The State's second witness was Officer Greg Cruse, a police officer with the Sidney Police Department. Officer Cruse testified that he assisted Officer White in the stop of Cromes and that from approximately 20 to 25 feet away that "you could not read the * * * numbers on the plates." On cross-examination, Officer Cruse admitted that he did not make any type of report and that there is no narrative that indicated his involvement in the stop.
 {¶ 15} After the State's two witness, Cromes testified on his own behalf. Cromes agreed that there were gray marks on his rear license plate and that he had never done anything to paint, blemish, or alter the back license plate on his vehicle. Cromes also noted that he has never been in a car accident that affected the back end of his vehicle; that he has had his license plates for three to four years; and, that his rear license plate was not in the same condition as it was when he first received it.
 {¶ 16} After Cromes testified, the trial court ordered Cromes to file his memorandum within fourteen days and then provided the State an additional fourteen days to respond. Cromes' counsel objected to the trial court's requirement that Cromes file his memorandum first, "because the burden in this case is on the prosecution, and that briefing schedule is just as if the burden * * * is on us." (Tr. p. 57). However, the trial court overruled Cromes' counsel's objection.
 {¶ 17} In March of 2006, the trial court issued its entry. In its entry, the trial court found that "Officer White made a valid investigatory stop of Defendant and that he had a reasonable articulable suspicion that Defendant had violated a traffic law, Revised Code Section 4503.21." (Mar. 27, 2006 Entry p. 2). Additionally, the trial court noted:
 After Officer White stopped the Defendant, he saw that he had read one number on the license plate incorrectly. He noticed this when he was about ten (10) feet behind the Defendant's vehicle. The officer reentered the license plate number into the computer and talked to the Defendant about the plates being difficult to read. Officer White then noticed an open container in the passenger seat of the vehicle, that Defendant's eyes were blood shot and glassy and that the Defendant had an odor of alcohol about him. Officer White shifted his focus to investigating a possible OVI offense. Once Officer White observed the indicia of OVI, he had new and independent facts for a reasonable and articulable suspicion that Defendant was engaging in OVI and he was entitled to continue his investigation for OVI.
(Mar. 27, 2006 Entry p. 2). Finally, the trial court overruled Cromes' motion to suppress.
 {¶ 18} In April of 2006, Cromes entered a no contest plea to the charge of operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a). After Cromes' change of plea, the trial court found Cromes guilty of operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a). Additionally, the trial court dismissed the charge of operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(d) and sentenced Cromes. Finally, the trial court stayed the execution of Cromes' sentence due to his intention to file an appeal.
 {¶ 19} It is from this judgment Cromes appeals, presenting the following assignments of error for our review:
 Assignment of Error No. I The trial court erred in finding the arresting officer made a valid investigatory stop of defendant-appellant.
 Assignment of Error No. II The trial court erred in finding the arresting officer had justification to continue to detain defendant-appellant after the purpose of the original stop was completed.
 Assignment of Error No. III The trial court erred in not permitting defendant-appellant to cross-examine the arresting officer as to the details of defendant-appellant's operation of his vehicle prior to the stop of the defendant-appellant.
 Assignment of Error No. IV The trial court erred in not permitting defendant-appellant to cross-examine the arresting officer as to whether or not defendant-appellant's license plate was improperly displayed when the basis for the arresting officer's continued detention of defendant-appellant was the purported offense of improper display of plates.
 Assignment of Error No. V The trial court improperly applied the law regarding burden of proof in a situation of a warrantless seizure; as a result, defendant-appellant was denied his constitutional right to due process.
 Assignment of Error Nos. I II {¶ 20} In his first assignment of error, Cromes argues that the trial court erred in finding that Officer White made a valid investigatory stop. In his second assignment of error, Cromes argues that the trial court erred in finding that Officer White had justification to continue to detain him after the purpose of the original stop was completed. Due to the nature of these assignments of error, we will address them together.
 {¶ 21} When ruling on a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented.State v. Johnson (2000), 137 Ohio App.3d 847, 850. An appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. State v. Dunlap, 73 Ohio St.3d 308, 314,1995-Ohio-243. However, an appellate court must also conduct a de novo review of the trial court's application of the law to the facts.State v. Hodge, 147 Ohio App.3d 550, 2002-Ohio-3053, at ¶ 9. TheFourth Amendment of the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures. Neither the Fourth Amendment of the United States Constitution nor Section 14, Article I of the Ohio Constitution explicitly provides that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court held that the exclusion of evidence is an essential part of the Fourth Amendment. Mapp v.Ohio (1961), 367 U.S. 643, 649. The primary purpose of the exclusionary rule is to remove the incentive to violate the Fourth Amendment and thereby deter police from unlawful conduct. State v. Jones,88 Ohio St.3d 430, 435, 2000-Ohio-374, abrogated by State v. Brown,99 Ohio St.3d 323, 2003-Ohio-3931.
 {¶ 22} The temporary detention of a person during a traffic stop is a seizure. State v. Downs, 6th Dist. No. WD-03-030, 2004-Ohio-3003, at ¶ 10, citing State v. Vass, 7th Dist. No. 01CA 4, 2002-Ohio-6887, at ¶ 12, citing Delaware v. Prouse (1979), 440 U.S. 648. And, there are two different types of traffic stops, each requiring a different constitutional standard to be lawful. State v. Moeller (Oct. 23, 2000), 12th Dist. No. CA99-07-128.
 {¶ 23} The first kind of constitutional traffic stop occurs when a police officer witnesses a violation of the traffic code and stops the motorist to issue a citation, a warning, or to effect an arrest. For this type of traffic stop to occur, the heightened standard of probable cause must underlie the stop. Bowling Green v. Godwin,110 Ohio St.3d 58, 2006-Ohio-3563, at ¶ 13, quoting Gaddis ex rel. Gaddis v. RedfordTwp. (E.D.Mich. 2002), 188 F.Supp.2d 762, 767. "Probable cause is determined by examining historical facts, i.e., the events leading up to a stop or search, `viewed from the standpoint of an objectively reasonable police officer.'" Godwin, 2006-Ohio-3563, at ¶ 14, quotingOrnelas v. United States (1996), 517 U.S. 690, 696. "Probable cause" is "a reasonable ground for belief of guilt." State v. Moore,90 Ohio St.3d 47, 49, 2002-Ohio-10. In this type of stop, the determination of probable cause "like all probable cause determinations, is fact-dependent and will turn on what the officer knew at the time hemade the stop." Godwin, 2006-Ohio-3563 at ¶ 14, quoting Dayton v.Erickson, 76 Ohio St.3d 3, 10, 1996-Ohio-431, quoting United States v.Ferguson (C.A.6, 1993), 8 F.3d 385, 391, (emphasis in original). Additionally, probable cause is provided when an officer had probable cause to believe that a traffic violation has occurred or was occurring.Moeller, supra; see Erickson, 76 Ohio St.3d at 3, syllabus ("Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity. (United States v. Ferguson [C.A.6,1993], 8 F.3d 385, applied and followed.)"); see, also, Whren v. United States (1996),517 U.S. 806, 819 ("Here the District Court found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment, the evidence thereby discovered is admissible * * *.").
 {¶ 24} The second kind of constitutional traffic stop is an investigatory stop. The Ohio Supreme Court has held that the question of whether an investigatory traffic stop is reasonable requires an "objective assessment of a police officer's actions in light of the facts and circumstances then known to the officer." Erickson,76 Ohio St.3d at 6 (citation omitted). An investigatory stop is the motorized equivalent of a "Terry" stop, id.; see Terry v. Ohio (1968), 392 U.S. 1, and requires satisfaction of the "Terry" standard to be constitutionally acceptable: "articulable and reasonable suspicion" that an offense has been or is being committed. Prouse, 440 U.S. at 673. The lesser standard of reasonable articulable suspicion is defined as the ability of the officer "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 20-21.
 {¶ 25} Here, Officer White testified that he had three reasons for stopping Cromes. Specifically, Officer White's reasons included (1) improperly displaying of license plates, because Cromes' rear license plate was difficult to read; (2) driving under suspension, because the plate number that he ran returned the name of a woman, who would have been driving under suspension; and, (3) for fictitious plates because the plate number that he ran came back to a Subaru and not a Ford. Also, the State conceded and the trial court found that Cromes had violated no traffic laws while he was driving.
 {¶ 26} R.C. 4503.21 is Ohio's statute on the display of license plates. R.C. 4503.21 provides, in pertinent part:
 No person who is the owner or operator of a motor vehicle shall fail to display in plain view on the front and rear of the motor vehicle the distinctive number and registration mark, including any county identification sticker and any validation sticker issued under sections 4503.19 and 4503.191 of the Revised Code, furnished by the director of public safety * * *. A motor vehicle that is issued two license plates shall display the validation sticker only on the rear license plate * * *. All license plates shall be securely fastened so as not to swing, and shall not be covered by any material that obstructs their visibility.
 {¶ 27} Upon our review of the record, the trial court found that Officer White could not read Cromes' rear license plate number. Specifically, Officer White testified that he read Cromes' rear license plate number as CKW 1220, which was difficult to read because of dirt or some manufacturer defect obscuring the numbers. Accordingly, we agree with the trial court that Officer White had a reasonable articulable suspicion that Cromes was violating R.C. 4503.21 and made a valid investigatory stop. See, e.g., State v. Lavalette, 6th Dist. No. WD-02-025, 2003-Ohio-1997, at ¶ 23; State v. Warner (July 6, 1998), 4th Dist. No. 97 CA 943.
 {¶ 28} We also note that the trial court found that after Officer White ran a check on Cromes' rear license plate, the computer returned that the plates belonged on a Subaru and not a Ford, which Cromes was driving, and that the plates were registered to a female driver, who was under a license suspension.
 {¶ 29} R.C. 4549.08 is Ohio's statute on the use of authorized plates. R.C. 4549.08 provides in pertinent part:
 (A) No person shall operate or drive a motor vehicle upon the public roads and highways in this state if it displays a license plate or a distinctive number or identification mark that meets any of the following criteria:
 Is fictitious;
 Is a counterfeit or an unlawfully made copy of any distinctive number or identification mark;
 Belongs to another motor vehicle, provided that this section does not apply to a motor vehicle that is operated on the public roads and highways in this state when the motor vehicle displays license plates that originally were issued for a motor vehicle that previously was owned by the same person who owns the motor vehicle that is operated on the public roads and highways in this state, during the thirty-day period described in division (A)(4) of section 4503.12 of the Revised Code.
 {¶ 30} Upon our review of the record, Officer White testified that after he ran a check on the license plate CKW 1220, the check provided that the license plate belonged on a Subaru. Accordingly, we find that Officer White had a reasonable articulable suspicion that Cromes was violating R.C. 4549.08 and made a valid investigatory stop.
 {¶ 31} R.C. 4510.11 is Ohio's statute on driving under suspension. R.C. 4510.11 provides, in pertinent part:
 (A) No person whose driver's or commercial driver's license or permit or nonresident operating privilege has been suspended under any provision of the Revised Code, other than Chapter 4509. of the Revised Code, or under any applicable law in any other jurisdiction in which the person's license or permit was issued shall operate any motor vehicle upon the public roads and highways or upon any public or private property used by the public for purposes of vehicular travel or parking within this state during the period of suspension unless the person is granted limited driving privileges and is operating the vehicle in accordance with the terms of the limited driving privileges.
 {¶ 32} Upon our review of the record, Officer White testified that after he ran a check on the license plate CKW 1220, the check provided that the owner's driver's license under suspension. Accordingly, we find that Officer White had a reasonable articulable suspicion that Cromes was violating R.C. 4510.11 and made a valid investigatory stop. See e.g., City of Rocky River v. Saleh (2000), 139 Ohio App.3d 313, 327.
 {¶ 33} Having found that Officer White made a valid investigatory stop,[1] we overrule Cromes' first assignment of error.
 {¶ 34} Next, we must consider the validity of Officer White's continued detention of Cromes after he realized that he incorrectly read Cromes' rear license plate.
 {¶ 35} It is established that once an officer lawfully stops an individual, the officer must carefully tailor the scope of the stop "to its underlying justification." Florida v. Royer (1983), 460 U.S. 491,500; see, also, State v. Gonyou (1995), 108 Ohio App.3d 369, 372;State v. Birchfield (Aug. 26, 1997), 4th Dist. No. 97 CA 2281. Additionally, the length of the stop must "last no longer than is necessary to effectuate the purpose of the stop." Royer,460 U.S. at 500. The rule set forth in Royer is designed to prevent law enforcement officers from conducting "fishing expeditions" for evidence of a crime. See Gonyou, supra; Sagamore Hills v. Eller (Nov. 5, 1997), 9th Dist. No. 18495.
 {¶ 36} An officer may, however, expand the scope of the stop and may continue to detain the individual without running afoul ofRoyer if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot. See, e.g., Terry, supra; State v. Robinette, 80 Ohio St.3d 234, 240,1997-Ohio-343; State v. Retherford (1993), 93 Ohio App.3d 586, 601. As the Court stated in Robinette, paragraph one of the syllabus:
 When a police officer's objective justification to continue detention of a person * * * is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure.
 {¶ 37} Thus, if a law enforcement officer, during a valid investigative stop, ascertains "reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." Id.,80 Ohio St.3d at 241; see, also, State v. Spindler, 4th Dist. No. 01CA2624, 2002-Ohio-2037.
 {¶ 38} A court that is determining whether a law enforcement officer possessed reasonable suspicion or probable cause to stop or to continue to detain an individual must examine the "totality of the circumstances." See, United States v. Arvizu (2002), 534 U.S. 266, 273. The totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that `might well elude an untrained person.'" Id. quoting United States v.Cortez (1981), 449 U.S. 411, 418.
 {¶ 39} Cromes contends that once Officer White noticed that he had called in the wrong license plate number, Officer White should not have approached the car to ask for his license and registration. Cromes relies on State v. Chatton (1974), 11 Ohio St.3d 59, certiorari denied (1984), 469 U.S. 856, for support.
 {¶ 40} The facts of Chatton are similar to the case sub judice. InChatton, a police officer stopped defendant's car for failure to display a license plate. However, once the officer approached the car, he noticed a temporary tag in the back window. Nevertheless, the officer approached the driver's side of the car and requested defendant's driver's license. After the officer called in the license information, the dispatcher gave the officer the erroneous information that defendant's license was suspended. After placing defendant under arrest for driving with a suspended license, the officer searched the car and found a handgun.
 {¶ 41} The Ohio Supreme Court held in Chatton that "where a police officer stops a motor vehicle which displays neither front nor rear license plates, but upon approaching the stopped vehicle observes a temporary tag which is visible through the rear windshield, the driver of the vehicle may not be detained further to determine the validity of his driver's license absent some specific and articulable facts that the detention was reasonable. As a result, any evidence seized upon a subsequent search of the passenger compartment of the vehicle is inadmissible under theFourth Amendment to the United States Constitution." Chatton, 11 Ohio St.3d at 63.
 {¶ 42} The Ohio Supreme Court also stated, "In our view, because the police officer no longer maintained a reasonable suspicion that appellee's vehicle was not properly licensed or registered, to further detain appellee and demand that he produce his driver's license is akin to the random detentions struck down by the Supreme Court inDelaware v. Prouse, supra. Although the police officer, as a matter of courtesy, could have explained to appellee the reason he was initially detained, the police officer could not unite the search to this detention, and appellee should have been free to continue on his way without having to produce his driver's license." Id.; see State v.Frye (1985), 21 Ohio App.3d 133, syllabus (holding that once an officer has determined that the driver has not violated any law, he has no authority to further detain the driver of an automobile in order to check the driver's license).
 {¶ 43} As noted above, Officer White stopped Cromes for (1) improperly displaying of license plates, because Cromes' rear license plate was difficult to read; (2) driving under suspension, because the plate number that he ran returned the name of a woman, who would have been driving under suspension; and, (3) for fictitious plates because the plate number that he ran returned came back to a Subaru and not a Ford. Additionally, the trial court found that when Officer White was approximately ten feet behind Cromes' vehicle, he realized that he had read one number on the license plate incorrectly. Therefore, once Officer White discovered that he read one number on Cromes' rear license plate incorrectly, he no longer maintained a reasonable suspicion that Cromes was driving under suspension or driving with fictitious plates. See State v. Yates, 166 Ohio App.3d 19, 22, 2006-Ohio-1424. Accordingly, we must determine whether Officer White maintained a reasonable suspicion that Cromes was in violation of R.C. 4503.21, for improperly displaying license plates, which would allow him to further detain Cromes and demand that he produce his driver's license.
 {¶ 44} The trial court's journal entry fails to make a finding of fact on whether Officer White maintained a reasonable suspicion that Cromes was in violation of R.C. 4503.21, which would allow him to further detain Cromes and demand that he produce his driver's license. The trial court's entry only provided, "The Court finds that Officer White made a valid investigatory stop of Defendant and that he had a reasonable articulable suspicion that Defendant had violated a traffic law, Revised Code Section 4503.21." (Mar. 27, 2006, Journal Entry p. 2). The following exchanges occurred in the record when Officer White was testifying regarding Cromes' license plate:
 {¶ 45} During direct examination:
 Q. [W]hy did you stop him?
 A. I was driving behind him. I read his license plate number
 which at the time I believed to be Charles King William 1220.
 The plate was difficult to read due to either some dirt or
 manufacturer defect. * * *.
 Q. And how far — when you observed that they were difficult to
 read, how far behind were you?
 A. Approximately 60 feet. * * *.
 * * *.
 Q. Okay. And when you stopped the Defendant, what did you
 do?
 A. As I approached the vehicle, I realized that the plate was
 actually Charles King William 1320.
 Q. Okay. So it was one number off?
 A. Yes.
 Q. Okay. And how close to the back of the car, the plates were
 you when you realized that?
 A. Approximately 10 feet.
 Q. Okay. And at that point did you continue your investigation
 regarding the failure to properly display the plates?
 A. I called dispatch, advised them of the correct plate. I then approached the driver to discuss the improper display.
(Tr. pp. 7-8, 10).
 {¶ 46} During cross-examination:
 Q. You then stopped the Defendant?
 A. Yes.
 Q. Before you got out, how far were you from the Defendant's
 vehicle when you stopped your cruiser?
 A. Approximately 20 feet.
 Q. Approximately 20 feet. And then you — you then left your
 cruiser?
 A. Affirmative.
 * * *
 Q. And you began your approach to Mr. Cromes' vehicle? A. Yes.
 Q. And while you were approaching the vehicle, you noticed that you had misread the license plate; is that correct? A. I didn't misread it. I couldn't read it.
 * * *
 Q. — when you were approaching the vehicle, you observed the license plate read CKW 1320? A. Right.
 * * *
 Q. And that was before you even got to Mr. Cromes' vehicle; is that — A. Right.
 * * *
 Q. Now, let's talk about what you observed after you saw that license plate. Okay? You, on direct examination — -(unintelligible) you indicated that, on your direct examination, that the problem with the license plates was either dirt or manufacturer defect? A. Correct. Q. Which was it? A. I couldn't tell. Q. You looked at it, did you not? A. Prior to this stop or after the stop? Q. No. When you got out of your vehicle. A. All right.
 Q. You looked at the plate? A. All right.
 Q. Correct?
 A. Correct.
 Q. Was there dirt on the plate?
 A. No.
 Q. So your earlier testimony that it was either dirt or
 manufacturer defect was inaccurate because you knew it was not
 dirt, correct?
 A. I knew it was not dirt after I approached.
 Q. And that there was no mud on the vehicle?
 * * *
 A. I do not believe so.
 Q. Specifically, there was no mud covering the lettering or numbering on the vehicle? A. No, there was not.
 Q. There was no type of obstruction from the car, something hanging from the truck that partially concealed the numbers on the license plate? A. No.
 Q. And the license plate was located where it was supposed to be located on this vehicle? A. Yes.
 Q. It had the proper registration information on it, did it not? A. Yes.
 Q. There was stickers that go on the vehicle. It had the proper stickers? A. Correct.
 * * *
 Q. Did you notice any paint where someone had painted over the numbers?
 A. No one had painted — Q. Tried to obscure the numbers? A. No one had painted over the numbers, no. Q. So it was clear to you that nothing had been done to try to obscure these numbers? A. Right.
 * * *
 Q. looking at the traffic ticket, did you cite him for improper display of license plates? A. No, I did not.
 Q. Is there any reference in your report to the fact that he had improperly displayed his license plate?
 A. Other than the beginning of the report where I read it, no.
 Q. You said that it's difficult to read?
 A. Correct.
 Q. All right. Is that — is that a violation of the law?
 A. It's improper display.
(Tr. pp. 18-19, 25-27, 35-36).
 {¶ 47} During redirect examination:
 Q. Well, my question is whether you smelled the odor of alcohol the first time or the second time that you went to the Defendant's car to talk with him, were you still investigating the failure to display license plates? A. Yes.
(Tr. p. 39).
 {¶ 48} Upon our review of the record, we find that Officer White's testimony does not establish that once he realized he had misread Cromes' license plate, Cromes was violating R.C. 4503.21. Our conclusion is further supported by Officer White admitting that Cromes' license plate was readable from a distance of approximately ten feet; that Cromes' license plate did not have dirt, mud, or paint on it that covered the lettering or numbering of it; that Cromes' license plate was not concealed by any obstruction; that Cromes' license plate was located where it was supposed to be located on the vehicle; that Cromes' license plate had the proper registration and stickers on it; and, that nothing had been done to Cromes' license plate in an attempt to obscure the numbers. Therefore, Officer White did not maintain a reasonable suspicion that Cromes was in violation of R.C. 4503.21, which would allow him to further detain Cromes and demand that he produce his driver's license. See, e.g., State v. Ronau, 6th Dist. No. L-02-1147, 2002-Ohio-6687, at ¶ 17 (finding that when an officer did not observe defendant driving erratically or violating any traffic laws prior to a traffic stop and that the stop was made solely because a trailer hitch was blocking a portion of the license plate, the trial court did not err by finding that the officer did not demonstrate a reasonable, articulable suspicion that defendant had violated the law); State v.Cooke (Sept. 24, 1999), 11th Dist. No. 98-L-160 (finding that appellant's temporary license tag was properly displayed because the police officer was able to discern the details from it as he approached appellant's car and therefore, the police officer no longer had a reason to doubt that appellant's vehicle was improperly registered or under suspension); State v. Jablonski (Sept. 8, 1995), 11th Dist. No. 95-L-026 (finding that when the police officers were able to decipher the registration numbers on appellant's temporary license placard prior to questioning defendant, "'the police officer[s] no longer maintained a reasonable suspicion that appellant's vehicle was not properly licensed or registered, * * * appell[ant] should have been free to continue on his way without having to produce his driver's license.' [Chatton, 11 Ohio St.3d at 63.] As such, appellant did not violate R.C. 4503.21, and the officers, pursuant to Chatton, were not permitted to further detain appellant."); State v. Graves (Dec. 21, 1988), 9th Dist. No. 2398. Cf. State v. Lavalette, 6th Dist. No. WD-02-025, 2003-Ohio-1997, at ¶ 23.
 {¶ 49} Accordingly, we find that once Officer White observed that he had misread Cromes' legible license plate, he no longer maintained a reasonable articulable suspicion that Cromes' vehicle was not properly licensed or registered and that Cromes was in violation of R.C. 4503.21. Therefore, there was no longer any justification that would allow Officer White to further detain Cromes and demand that he produce his driver's license.
 {¶ 50} However, as noted above, the Ohio Supreme Court inChatton stated, in dicta, that when a police officer no longer has a reasonable articulable suspicion to continue to detain the driver of the car pulled over in a traffic stop, "as a matter of courtesy" the officer could explain to the driver why he or she has stopped the vehicle.Chatton, 11 Ohio St.3d at 63; see, e.g., Lavalette, supra, at ¶ 19;State v. Baumgartner (June 11, 1999), 6th Dist. No. L-98-1282. As a matter of practicality and courtesy, we agree with the Supreme Court that Officer White could have informed Cromes about why he was pulled over.
 {¶ 51} Nevertheless, while we agree that Office White could have informed Cromes about why he was pulled over, Officer White cannot unite the smell of an alcoholic beverage on Cromes to this detention.[2] SeeChatton, 11 Ohio St.3d at 63. Upon our review of the record, we cannot find that Officer White had any further, independent, reasonable articulable suspicion that Cromes was engaged in criminal behavior. Absent some other basis to justify the continued detention of Cromes to conduct an investigation, we find that the motion to suppress should have been granted. Accordingly, we find the trial court erred as a matter of law when it denied Cromes' motion to suppress. Cromes' second assignment of error is sustained.
 Assignments of Error Nos. III, IV, V {¶ 52} In his third assignment of error, Cromes argues that the trial court erred in not permitting him to cross-examine Officer White regarding the operation of his vehicle prior to the traffic stop. In his fourth assignment of error, Cromes argues that the trial court erred in not permitting him to cross-examine Officer White regarding whether his license plates were improperly displayed. In his fifth assignment of error, Cromes argues that the trial court erred when it incorrectly placed the burden of proof on him.
 {¶ 53} Our disposition of Cromes' first and second assignments of error renders his third, fourth, and fifth assignments of error moot and we decline to address them. App. R. 12(A)(1)(c).
 {¶ 54} Having found error prejudicial to the appellant herein, in the particulars assigned and argued in the second assignment of error, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.
Judgment reversed and cause remanded.
 BRYANT, P.J, concurs.
 CUPP, J., concurs in judgment only.
[1] Finding that Officer White made a valid investigatory stop, we do not need to consider whether Officer White had probable cause to stop Cromes.
[2] We also note that, based upon the Ohio Supreme Court's decision inChatton, the determination of whether Officer White smelled alcoholic beverage on Cromes during his first or second "courtesy" approach is irrelevant.