[Cite as *State v. Salyer*, 2013-Ohio-140.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO. 9-12-29

    v.

STEPHEN M. SALYER,                 O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion Municipal Court
Trial Court No. TRC 11 7483

Judgment Affirmed

Date of Decision:    January 22, 2013

APPEARANCES:

    *J.C. Ratliff and Jeff Ratliff* for Appellant

    *Steven E. Chaffin* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Stephen M. Salyer ("Salyer") appeals the judgment of the Marion Municipal Court sentencing him to 90 days in jail, with 87 suspended, after Salyer was found guilty of OVI in violation of R.C. 4511.19(A)(1)(a) following Salyer's plea of no contest to the charge. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On September 17, 2011, at approximately 1:39 a.m., Trooper David Shockey observed a vehicle make a left turn without signaling and initiated a traffic stop. Trooper Shockey approached the vehicle and learned that Salyer was the driver. While speaking with Salyer, Trooper Shockey detected a "moderate odor" of an alcoholic beverage and Trooper Shockey observed that Salyer's eyes were glassy, though not bloodshot. According to Trooper Shockey, Salyer was very talkative, and Salyer admitted to having a rum and coke approximately three hours prior to the stop.

{¶3} Subsequently Trooper Shockey asked Salyer to exit his vehicle in order to perform field sobriety tests. Trooper Shockey first administered the HGN test, observing two clues of impairment in each of Salyer's eyes. Trooper Shockey then administered an alphabet test, the one legged Stand test, and the walk and turn test. Salyer did not complete the one leg stand test. According to Trooper Shockey, Salyer said of the one leg stand test "well, I couldn't do that

so…[.]" (Tr. at 23). Trooper Shockey indicated that Salyer caught himself just before he said "sober" and said instead later on "well, I couldn't do that—you can come and find me at 3:00 tomorrow afternoon I couldn't do that test." (*Id.*) Trooper Shockey stated that he observed one clue of impairment on the walk and turn test. Taking into consideration the clues on the tests and his observations of Salyer, Trooper Shockey then arrested Salyer.

{¶4} Salyer was taken to the Multi-County jail and asked to submit to a breath test on the Datamaster. Salyer did so and his BAC registered at .093, in excess of the legal limit. Salyer was ultimately charged with OVI in violation of R.C. 4511.19(A)(1)(a), and (A)(1)(d), and making a left turn without the use of a turn signal in violation of R.C. 4511.39. (Doc. 1).

{¶5} On September 20, 2011, Salyer pled not guilty to the charges, waived his speedy trial rights, and demanded a jury trial. (Doc. 4).

{¶6} On December 8, 2011, Salyer filed a twenty-two page motion to suppress challenging the stop, his detainment, the field and breath tests, and his arrest. (Doc. 11).

{¶7} On December 27, 2011, the State filed a motion to limit or strike Salyer's motion to suppress on the grounds that it was untimely. (Doc. 13).

{¶8} On December 28, 2011, the trial court denied the State's motion to strike, adding that the State's motion to limit Salyer's motion to suppress would be addressed at the hearing on the motion to suppress. (Doc. 14).

{¶9} On December 29, 2011, the trial court held a hearing on the motion to suppress. At the hearing, Salyer, through counsel, narrowed the issues from the motion to suppress that would be challenged in the hearing. Salyer's counsel specifically challenged "[c]ompliance with NHTSA on the administration of the field sobriety testing, reasonable suspicion to detain further after the stop, probable cause to arrest, lack of Miranda upon arrest and – and the results of the breath test machine." (Dec. 29, 2011, Tr. at 4).

{¶10} The State called Trooper Shockey who testified to his credentials, experience, and the events as described above. Salyer's counsel cross-examined Trooper Shockey, but the hearing was ultimately continued to hear further testimony.

{¶11} On February 16, 2012, the hearing resumed. At the hearing, Trooper Benjamin Addy of the State Highway Patrol in Marion County explained the calibration procedures for the DataMaster. Trooper Addy also testified that he was the person that calibrated the breath machine on September 11, 2011, and September 18, 2011, the week prior to and the day after Salyer's breath test. (Tr.

91, 93). At the conclusion of Trooper Addy's testimony, the State rested. No witnesses were called by Salyer.

{¶12} On March 28, 2012, the trial court overruled Salyer's motion to suppress. As part of this ruling, the trial court cited the testimony of Trooper Shockey and Trooper Addy and the video of the stop as support for overruling the motion.

{¶13} On April 9, 2012, Salyer changed his plea of not guilty and entered a plea of no contest, with a stipulated finding of guilty. (Doc. 59). The trial court accepted this plea and sentenced Salyer to 90 days in jail, with 87 suspended.[1] (*Id.*)

{¶14} It is from this judgment that Salyer appeals, asserting the following assignment of error for our review.

**ASSIGNMENT OF ERROR**
**THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AS (1) THE OFFICER DID NOT POSSESS A REASONABLE AND ARTICULABLE SUSPICION JUSTIFYING THE CONTINUED DETENTION OF THE DEFENDANT BEYOND THE SCOPE OF THE INITIAL STOP; (2) THE FIELD SOBRIETY TESTS AND CHEMICAL TEST WERE NOT DONE IN SUBSTANTIAL COMPLIANCE WITH NHTSA OR ITS EQUIVALENT AND THE OHIO DEPARTMENT OF HEALTH RULES AND REGULATIONS; (3) THE OFFICER DID NOT POSSESS A REASONABLE AND ARTICULABLE SUSPICION JUSTIFYING THE ADMINISTRATION OF FIELD SOBRIETY TESTS; AND (4) THE OFFICER DID NOT**

---

[1] Salyer was also sentenced to pay a $1,000 fine, with $625.00 suspended, Salyer's license was suspended for six months, and Salyer was ordered to attend a driver intervention program. (Doc. 59).

**POSSESS PROBALE CAUSE TO ARREST THE DEFENDANT.**

{¶15} In his assignment of error, Salyer argues that the trial court erred in overruling his motion to suppress. Salyer asserts four specific grounds to support his contention.

{¶16} Initially, we note that appellate review of a decision on a motion to suppress evidence presents a mixed question of law and fact. *State v. Bressler*, 3d Dist. No. 15–05–13, 2006–Ohio–611. At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a trial court's decision on a motion to suppress, an appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dunlap*, 73 Ohio St.3d 308, 314 (1995). We must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of the witnesses," and then independently review whether the trial court applied the correct legal standard. *State v. Anderson*, 100 Ohio App.3d 688, 691 (4th Dist.1995).

{¶17} In Salyer's first and third grounds for contending the trial court erred in overruling his motion to suppress, Salyer argues that his continued detention exceeded the scope and duration of the stop, and that Trooper Shockey did not have reasonable, articulable suspicion to conduct field sobriety tests. The State

contends Trooper Shockey had reasonable, articulable suspicion that Salyer was engaged in criminal activity (OVI) that would justify Salyer's continued detention and the administration of the field sobriety tests.

{¶18} When conducting a stop of a motor vehicle for a traffic violation, an "officer may detain an automobile for a time sufficient to investigate the reasonable, articulable suspicion for which the vehicle was initially stopped." *State v. Smith*, 117 Ohio App.3d 278, 285, 690 N.E.2d 567 (1st Dist.1996). However, the duration of the stop "is limited to 'effectuate the purpose for which the initial stop was made.'" *Id*., quoting *State v. Venham*, 96 Ohio App.3d 649, 655 (4th Dist.1994), citing *United States v. Brignoni–Ponce*, 422 U.S. 873 (1975); *State v. Chatton*, 11 Ohio St.3d 59, 63 (1994). "Thus, when detaining a motorist for a traffic violation, an officer may delay the motorist for a time period sufficient to issue a ticket or a warning." *Smith* at 285, citing *State v. Keathley*, 55 Ohio App.3d 130 (2d Dist.1998). This time period also includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates. *See Delaware v. Prouse*, 440 U.S. 648, 659 (1979).

{¶19} The detention of a stopped driver may continue beyond the time frame necessary to conduct the stop for purposes of the traffic violation when "additional facts are encountered that give rise to a reasonable, articulable suspicion [of criminal activity] beyond that which prompted the initial stop[.]"

*Smith* at 285, citing *State v. Myers*, 63 Ohio App.3d 765, 771 (2nd Dist.1990); *Venham* at 655. Reasonable articulable suspicion exists when there are "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *State v. Stephenson*, 3d Dist. No. 14-04-08, 2004-Ohio-5102, ¶ 16, quoting *State v. Bobo*, 37 Ohio St.3d 177, 178 (1988).

**{¶20}** An officer's request to perform field sobriety tests must be separately justified by specific, articulable facts showing a reasonable basis for the request. *State v. Evans*, 127 Ohio App.3d 56, 62-63 (11th Dist.1998), citing *Yemma*, *supra*. "Although the facts that served as the impetus for the stop may also assist in providing this separate justification, additional articulable facts are necessary." *Id*.

**{¶21}** Whether a law enforcement officer possessed reasonable suspicion or probable cause to continue to detain an individual must also be examined in light of the "totality of the circumstances." *State v. Cromes*, 3d Dist. No. 17-06-07, 2006-Ohio-6924, ¶ 38, citing *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002). The totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.,* citing *Arvizu*, 534 U.S. at 273, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690 (1981).

{¶22} Circumstances from which an officer may derive a reasonable, articulable suspicion that the detained driver was operating the vehicle while under the influence include, but are not limited to:

> **(1)  the time and day of the stop (Friday or Saturday night as opposed to, e.g., Tuesday morning); (2) the location of the stop (e.g., whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong," "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given.**

*Evans*, 127 Ohio App.3d at 63, Fn. 2.  "All of these factors, together with the officer's previous experience in dealing with [impaired] drivers, may be taken into account by a reviewing court in determining whether the officer acted reasonably. No single factor is determinative." *Id.*

{¶23} At the suppression hearing, Trooper Shockey testified that he stopped Salyer's vehicle at approximately 1:39 a.m. on September 17, 2011, for failing to use a left turn signal when turning left.  Trooper Shockey testified that

when he spoke with Salyer, Trooper Shockey detected a "moderate" odor of an alcoholic beverage. According to Trooper Shockey, Salyer was very talkative and Salyer admitted to consuming a rum and coke approximately three hours prior to the stop. Trooper Shockey testified that Salyer's eyes were glassy, though not bloodshot.

{¶24} The trial court cited the time, odor of an alcoholic beverage, glassy eyes, and admission of the consumption of alcohol as support for Trooper Shockey's detainment of Salyer in its entry denying Salyer's motion to suppress.[2] (Doc. 46).

{¶25} Based on the evidence in the record, we conclude that Trooper Shockey encountered additional facts to give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop. We further conclude that Trooper Shockey's reasonable, articulable suspicion that Salyer was driving while impaired justified the prolonged detention to administer the field sobriety tests. Accordingly, we find no error with the trial court's decision to overrule Salyer's motion to suppress on either of these bases.

{¶26} As the next ground for contending that the trial court erred in overruling his motion to suppress, Salyer argues that the field sobriety tests and

---

[2] The trial court also cited the fact that Salyer pulled over on the wrong side of the road. (*Id.*) On appeal, Salyer argues that he pulled over on the wrong side of the road out of convenience/necessity. The video of the stop does indicate that Salyer pulled over on the left side of the road; however, the video also illustrates that cars were parked all along the right side of the road, thus there is no indication as to whether this action was done out of necessity or convenience.

the chemical breath test were not administered in substantial compliance with the applicable guidelines, and therefore the results from these tests should have been suppressed.

{¶27} In order for the results of field sobriety tests to be admissible, the State is not required to show strict compliance with testing standards, but must instead demonstrate that the officer substantially complied with NHTSA standards. R.C. 4511.19(D)(4)(b); *State v. Clark*, 12th Dist. No. CA2009-10-039, 2010-Ohio-4567, ¶ 11. "A determination of whether the facts satisfy the substantial compliance standard is made on a case-by-case basis." *State v. Fink*, 12th Dist. Nos. CA2008-10-118, CA2008-10-119, 2009-Ohio-3538, ¶ 26. The State may demonstrate what the NHTSA standards are through competent testimony and/or by introducing the applicable portions of the NHTSA manual. *State v. Boczar*, 113 Ohio St.3d 148, 153, 2007-Ohio-1251, at ¶ 28.

{¶28} At the suppression hearing and on appeal, Salyer does not identify specific errors with Trooper Shockey's administration of the field sobriety tests, in light of NHTSA or other applicable guidelines, but nevertheless Salyer argues that suppression of the test results is warranted.[3]

{¶29} Regarding the Field Sobriety Tests, the trial court's entry denying the motion to suppress stated the following:

---

[3] At the suppression hearing, Salyer did seem to question the fact that Trooper Shockey administered an "alphabet test" to Salyer after the HGN and before the other tests, but he does not renew this argument on appeal.

**In this case, Defendant Salyer contends that the field sobriety tests were not conducted in substantial compliance with NHTSA standards. Trooper Shockey testified that he administered standardized field sobriety tests which included the HGN, the One-Leg Stand and the Walk and Turn Tests. In explaining his administration of the HGN test, Shockey stated that he checked for visual or other distractions, and he checked for eyeglasses. He further testified as to how he positioned the stimulus and that he detected 4 clues while checking for lack of smooth pursuit and 4 clues while checking for distinct nystagmus at maximum deviation.[4] Shockey did not detect any clues on the onset of nystagmus prior to 45 degrees. Finally, Trooper Shockey stated that he administered the HGN "as explained in the manual".**

**On the One-Leg Stand test, Trooper Shockey testified, and the video revealed, as to how he set up the test conditions and how he instructed and positioned the defendant. When the trooper instructed the defendant to begin, he could not perform the test and stated, "I couldn't do this even if I was sob…..(sober)[.]" He continually touched the ground with his foot. Shockey testified that he found that the defendant could not perform the test, but did not offer any number of clues that he detected.**

**On the Walk and Turn, Trooper Shockey's testimony and the video revealed that he set up the test conditions and that he explained and demonstrated the test asking questions as to the defendant's understanding of the instructions. Thereafter, Shockey testified that he detected 1 clue, but the video actually recorded 2 clues: stepped off the line and used arms to balance, lifting them more than six inches from his side.**

---

[4] We note that it is not clear whether the trial court's characterization directly corresponds to Trooper Shockey's testimony. Trooper Shockey testified, "Yes, I observed a total of four clues, two in each eye, I observed a nystagmus, maximum deviation and lack of smooth pursuit. I did not observe nystagmus prior to 45 degrees." (Tr. at 21). However, even if the trial court's characterization is improper—for example, if the trial court was stating there were 4 clues in each eye (which is not possible as there are only 6 clues total, 3 in each eye)—any misstatement would not change the outcome here. The HGN results were not considered by the trial court.

> **Based on the testimony and evidence presented, the Court is unable to find clear and convincing evidence that Trooper Shockey administered the HGN test in substantial compliance with NHTSA standards. However, the Court finds clear and convincing evidence that the One-Leg Stand and Walk and Turn tests were administered in substantial compliance.**

(Doc. 46).

{¶30} Thus the trial court found that the HGN test was not done in compliance with NHTSA standards but the one leg stand and walk and turn test were conducted in substantial compliance with recognized standards. The record supports the trial court's findings. Trooper Shockey testified at the suppression hearing that he received Alcohol Detection and Prosecution (ADAP) training and that he administered the tests according to the NHTSA manual. (Tr. at 16, 20, 22-23).

{¶31} Even assuming *arguendo* that we find that Trooper Shockey did not substantially comply with NHTSA or other applicable standards—which would require the results of the tests to be excluded—Trooper Shockey's testimony regarding Salyer's performance on nonscientific field sobriety tests is admissible under Evid.R. 701 and can support a finding of probable cause to arrest under the totality of the circumstances analysis. *See State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, ¶¶ 14-15. Notwithstanding this fact, we find no error in the trial court's conclusion that the State met its burden in demonstrating that Trooper

Shockey's administration of the one-leg stand and walk and turn tests substantially complied with NHTSA standards.[5]

**{¶32}** Next, Salyer challenges the admissibility of the results from the breath analysis test and asserts that the State failed to demonstrate that the test was conducted in substantial compliance with the regulations prescribed by the Director of the Ohio Department of Health. Specifically Salyer argues the State failed to show that Salyer's test was conducted free of any radio frequency interference ("RFI"). Salyer also argues that the State did not establish that it had kept three years of records on the Datamaster as required by the Ohio Department of Health Rules.

**{¶33}** In seeking to suppress the results of a breath analysis test, the defendant must set forth an adequate basis for the motion. *State v. Shindler*, 70 Ohio St.3d 54, 58, 1994-Ohio-452. The motion must state the "* * * legal and factual bases with sufficient particularity to place the prosecutor and court on notice as to the issues contested." *Id*; Crim.R. 47. Once an adequate basis for the motion has been established, the prosecution then bears the burden of proof to demonstrate substantial compliance with the Ohio Department of Health regulations. *Xenia v. Wallace*, 37 Ohio St.3d 216, 220 (1988). If the prosecution demonstrates substantial compliance, the burden of proof then shifts to the

---

[5] As the court found that the HGN test was not done in substantial compliance with recognized guidelines, we need not conduct a similar analysis regarding this test.

defendant to overcome the presumption of admissibility and demonstrate that he or she was prejudiced by anything less than strict compliance. *State v. Burnside*, 100 Ohio St.3d 152, 157, 2003-Ohio-5372, ¶ 24.

{¶34} The extent of the State's burden to show substantial compliance varies with the degree of specificity of the violation alleged by the defendant. "When a defendant's motion to suppress raises only general claims, along with the Ohio Administrative Code sections, the burden imposed on the state is fairly slight." *State v. Johnson*, 137 Ohio App.3d 847, 851 (2000). Specifically, when a motion fails to allege a fact-specific way in which a violation has occurred, the state need only offer basic testimony evidencing compliance with the code section. *State v. Bissaillon*, 2d Dist. No. 06–CA–130, 2007-Ohio-2349, ¶ 15.

{¶35} Salyer's motion to suppress did allege that Trooper Shockey did not ensure that Salyer's test was conducted free of any radio transmissions from within the affected RFI zone. Salyer's counsel also raised this issue at the suppression hearing and questioned Trooper Shockey regarding RFI interference on cross-examination. On direct-examination at the suppression hearing, Trooper Shockey testified that he was a Senior Operator with authority to perform testing on the BAC Datamaster. (Tr. at 17). On cross-examination, Salyer's counsel specifically questioned Trooper Shockey regarding potential RFI interference.

What follows is testimony that was elicited from Trooper Shockey on cross-examination:

**Q: [Defense on Cross-examination] There are two people at all times in the Multi-County booking room, correct?**

**A: [Trooper Shockey] No.**

**Q: No. It's not their policy to have two people in the booking room?**

**A: I'm not – I don't know what their policy is, but I know what the reality of things are.**

**Q: Okay. That night in question how many people were in the booking room.**

**A: I have no clue, I don't remember.**

**Q: Okay. So there could have been two, correct?**

**A: There could have been.**

**Q: Okay. And they wear radios, correct?**

**A: Correct.**

**Q: And they – according to their policy they don't turn those radios off because – in case of an emergency at the jail and they're required to respond, correct?**

**A: Correct.**

**Q: Okay. So upon administering the test you didn't ask either one of them to leave, did you?**

**A: No.**

**Q: Okay. And upon administering the test I didn't hear any testimony that your radio was off?**

**A: I don't know if it was or wasn't.**

(Tr. 66-67).

{¶36} The State's other witness, Trooper Addy, also offered some testimony regarding RFI related to the Datamaster in question. Trooper Addy testified that he performed the RFI check on the Datamaster September 11, 2011, at approximately 7:27, within the weekly range of testing. (Tr. at 107). Trooper Addy testified that the Datamaster was functioning properly. Trooper Addy also testified that he performed the weekly check on September 18, 2011, after Salyer's test, and that machine was functioning properly.

{¶37} While Salyer argues on appeal that Trooper Shockey did not insure that no RFI interference was present during testing, the preceding testimony does not affirmatively establish that there was RFI interference in Salyer's test. First, whereas on appeal Salyer argues that two other officers were in the room when Salyer took his breath test and that Trooper Shockey's radio was on, no testimony affirmatively establishes this fact. Trooper Shockey testified that he could not

remember whether other people were in the room, and that he could not remember whether his radio was on. This testimony does not, in any way, establish that there were definitely radios on during Salyer's test within a range that could disrupt the Datamaster.

{¶38} Second, at the hearing, Salyer called no witnesses to testify as to how these "hypothetical" radios that were *potentially* on in the room at the time of the test caused any actual interference with Salyer's specific test. There is no evidence connecting any of the radios that may or may not have been on or present to any actual RFI interference. Under these circumstances we cannot find that the trial court erred in overruling Salyer's motion to suppress the breath test based on the tenuous connection of RFI interference advocated by Salyer.

{¶39} Salyer's argument regarding record keeping is similarly nebulous. On appeal, Salyer claims that in his motion to suppress and at the suppression hearing he challenged the record keeping related to the Datamaster. According to Salyer, the Ohio Department of Health requires three years of records to be maintained on the testing machine. Salyer contends that the State did not establish substantial compliance with this rule. It is not clear from Salyer's motion to suppress, the testimony at the suppression hearing, or Salyer's brief to this court how there was any failure in record keeping or how any alleged failure affected the results of Salyer's test.

{¶40} Trooper Addy testified that he had performed the required instrument checks the week prior to Salyer's test on September 11, 2011, and the week (day) following Salyer's test, September 18, 2011.[6] According to Trooper Addy's testimony, the machine was functioning properly. It is unclear from the record how any lack of records months or years prior to the date of the test in question caused an issue warranting suppression of the breath test. Based on the foregoing, we cannot find that the trial court erred in its ruling not to suppress the breath test results.

{¶41} In his final argument, Salyer argues that the court erred in concluding that probable cause existed to arrest Salyer. The trial court's entry regarding probable cause reads as follows:

> **In this case, Trooper Shockey took into consideration the fact that the defendant stopped his car on the left side of the street facing the wrong way; that the defendant had admitted to drinking three (sic) rum and cokes prior to the stop; that there was an odor of alcohol from the defendant's breath and person; that the defendant's eyes were glassy; that the defendant exhibited an extraordinary amount of talkativeness; the observations that he made as Defendant performed the standardized field sobriety tests; and the clues presented from the Walk and Turn and the defendant's inability to perform the One Leg Stand. These facts and events, given the totality of the circumstances, would have warranted a reasonable person such as the trooper to believe that Defendant Salyer committed a violation of ORC 4511.19.**

(Doc. 46).

---

[6] Calibration checks were conducted every seven days.

{¶42} We note that the trial court mistakenly characterizes the amount of alcohol that Salyer admittedly consumed; Salyer admitted to having one rum and coke three hours prior to the stop, not three drinks. We further note that while Trooper Shockey may have considered the fact that Salyer's vehicle was stopped on the wrong side of the road, and that this fact was clearly displayed in the video thereby being properly considered by the trial court, Trooper Shockey did not testify that this was a factor in determining his probable cause.

{¶43} Despite the trial court's mischaracterizations, we find that the remaining facts and circumstances, even without considering the HGN test, still would give rise to probable cause to arrest Salyer for OVI. In addition to the facts cited by the trial court that were established in the record, we would also point to the time being a factor, since it was approximately 1:39 a.m., and we would also point to Trooper Shockey's testimony that Salyer had been about to say "well I couldn't even do that so[ber]." (Tr. at 23). These facts taken with Salyer's admission to drinking, his glassy eyes, his traffic violation, the clue on the walk and turn, Salyer's inability to perform the one leg stand test, and the moderate odor of alcohol could lead to probable cause.[7] Under the totality of the circumstances, we cannot find that the trial court erred in finding there was probable cause to arrest Salyer.

---

[7] As the trial court did not find that the HGN test was done in substantial compliance with recognized standards, we did not use the HGN clues in our review of probable cause.

{¶44} For the foregoing reasons Salyer's assignment of error is overruled and the judgment of the Marion Municipal Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**