[Cite as *State v. White*, 2014-Ohio-555.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                 CASE NO.  1-13-27

     v.

LARRY L. WHITE,                     O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Lima Municipal Court
Trial Court No. 12 TRC 01916

Judgment Affirmed

Date of Decision:   February 18, 2014

APPEARANCES:

     *Andrew R. Bucher* for Appellant

     *E. Richard Eddy, II*  for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Larry L. White brings this appeal from the judgment of the Lima Municipal Court in Allen County, Ohio, denying in part his motion to suppress evidence collected at an OVI (operation of a vehicle while under the influence of alcohol) roadblock, on March 16, 2012. For the reasons that follow we affirm the judgment of the trial court.

{¶2} On March 16, 2012, between 9 p.m. and midnight, the Ohio State Highway Patrol operated an OVI checkpoint in Allen County, Ohio. At around 10:14 p.m., White drove into the checkpoint and was approached by Trooper Matthew Geer of the Ohio State Highway Patrol, Findlay post. Upon talking to White, Trooper Geer noticed a strong odor of alcoholic beverage coming from inside White's vehicle and noticed that White's face was flushed and his eyes were bloodshot. (Mot. Hr'g Tr. at 8, July 13, 2012 and Sept. 4, 2012.) Trooper Geer also recognized White to have slurred speech. (*Id.*) White admitted that he had had about three beers that night. He was then asked to pull into the parking lot and perform three field sobriety tests. (*Id.* at 8-22.) Based on White's performance on those tests, Trooper Geer believed that White was operating under the influence of alcohol and placed him under arrest. (*Id.* at 22-24.)

{¶3} Initially, White was placed in a police cruiser, but he was later moved to a command center vehicle, "a trailer wherein a portable Intoxilyzer 8000 breath-

testing machine was located." (*Id.* at 24; R. 24, J. Entry at 3.) Trooper Geer asked White for his consent to submit to a chemical test and then read him the "BMV 2255" form. (Tr. at 24-25.) After this test showed that White was driving with a prohibited concentration of alcohol in his system, he was issued a citation for operating a vehicle under the influence of alcohol. (R. at 24, at 4.) White was then released. (*Id.*)

{¶4} White pled not guilty to the charges against him and filed a motion to suppress, requesting that the trial court exclude the evidence obtained during his warrantless seizure. (R. at 12.) White requested suppression of the following: (1) coordination and/or sobriety tests; (2) alcohol and/or drug level tests; (3) statements taken from or made by White; (4) White's exercise of his right to remain silent; (5) observations and opinions of the police officer(s) who stopped and/or arrested and/or tested White; (6) results of the field sobriety tests performed by White and/or video or audio recordings of the stop and tests. (R. at 12.) As one of the reasons for his motion, White contended that the OVI roadblock was unauthorized and therefore, the stop of his vehicle at the roadblock was unconstitutional, violating his protection against unreasonable searches and seizures. He further argued that even if the initial stop was valid, his arrest was unconstitutional because the field sobriety tests that gave Trooper Geer probable cause for the arrest did not comply with statutory requirements of R.C.

4511.19(D)(4)(B). White also argued that the breath test was coerced and improperly performed. He requested an oral hearing on the motion.

{¶5} After conducting a two-day motion hearing, the trial court suppressed evidence of one of the three field sobriety tests, but it overruled the motion to suppress in all other respects. (R. at 24.) Subsequently, White entered a plea of no contest and was found guilty of operating a vehicle while impaired and/or operating a vehicle with a prohibited blood alcohol content in violation of R.C. 4511.19(A)(1)(a) and (A)(1)(d). (R. at 28, J. Entry OVI Sentence.) He was subsequently sentenced but the sentence was stayed pending this appeal.

{¶6} White now appeals the trial court's denial of his motion to suppress raising five assignments of error.

I.    THE TRIAL COURT ERRED WHEN IT DETERMINED THE OVI ROADBLOCK USED TO STOP APPELLANT WAS CONSTITUTIONAL

II.   THE TRIAL COURT ERRED WHEN IT DETERMINIEND [sic] THAT APPELLANT'S SUBMISSION TO THE BREATH TEST WAS NOT A PRODUCT OF COERCION

III.  THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE 20 MINUTE OBSERVATION PERIOD WAS SUBSTANTIALLY COMPLIED WITH

IV.   THE TRIAL COURT ERRED IN DETERMINING THAT THE BREATH TEST WAS PROPERLY ADMINISTERED AND ADMISSABLE [sic] AS THE DRY GAZ WAS EXPIRED

### V. THE TRIAL COURT ERRED IN FINDING THERE WAS PROBABLE CAUSE TO ARREST MR. WHITE

*Standard of Review*

**{¶7}** Before addressing White's assignments of error we note the applicable standard of review. An appellate review of the trial court's decision on a motion to suppress involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Norman*, 136 Ohio App.3d 46, 51, 735 N.E.2d 953 (3d Dist.). We will accept the trial court's factual findings if they are supported by competent, credible evidence because the "evaluation of evidence and the credibility of witnesses" at the suppression hearing are issues for the trier of fact. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992); *Burnside*, 2003-Ohio-5372, at ¶ 8; *Norman*, 136 Ohio App.3d at 51. But we must independently determine, without deference to the trial court, whether these factual findings satisfy the legal standard as a matter of law because "the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review." *Norman*, 136 Ohio App.3d at 52; *Burnside*, 2003-Ohio-5372, at ¶ 8.

**{¶8}** With this standard in mind, we proceed to review the issues raised by White as they pertain to the trial court's denial of his motion to suppress.

*1. First Assignment of Error— Constitutionality of the OVI Roadblock*

**{¶9}** White contends that the OVI roadblock at issue was unconstitutional because it was based on the request that was "supported only by a conclusory statement, devoid of facts or empirical data, then approved by a higher divisions [sic] of the highway patrol." (App't Br. at vi.) Therefore, White alleges that his stop at the checkpoint and the subsequent arrest were in violation of the United States Constitution and the Ohio Constitution.

**{¶10}** The Ohio Supreme Court held that the constitutional provisions affording protection against "unreasonable searches and seizures" are implicated in cases involving a vehicle stop at a checkpoint "because a vehicle stop at a highway checkpoint constitutes a 'seizure' within the meaning of the Ohio and United States Constitutions." *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001); *accord Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) ("a Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint"). Yet, highway checkpoints or roadblocks are not per se unconstitutional and they have been upheld by the United States Supreme Court and the Ohio Supreme Court. *See Sitz*, 496 U.S. 444; *Orr*, 91 Ohio St.3d 389.

**{¶11}** In 1990, the Supreme Court of the United States established a three-pronged balancing test by which to determine the constitutionality of the sobriety

checkpoints. *See Sitz*, 496 U.S. 444. In 2001, the Ohio Supreme Court followed the Supreme Court of the United States and other federal and state courts, and applied the three-prong balancing test to a driver's license checkpoint in Ohio, noting that the same test is used for sobriety checkpoints and immigration checkpoints. *Orr*, 91 Ohio St.3d at 392-393, following *Sitz*, 496 U.S. 444, *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), *United States v. McFayden*, 865 F.2d 1306 (D.C.Cir.1989), *and State v. Cloukey*, 486 A.2d 143 (Me.1985). Therefore based on *Orr*, the Ohio standard for determining the constitutionality of a roadblock, requires a case-by-case evaluation of "[1] the checkpoint's intrusion on privacy, [2] the state's interest in maintaining the checkpoint, and [3] the extent to which the checkpoint advances the state interest." *Id.* at syllabus, 392-393.

{¶12} In spite of this well-established standard, White claims in his brief that "[a]n OVI Roadblock is tested for constitutionality in Ohio through the second district four part test," established in a 1984 Second Appellate District case, *State v. Goines*, 16 Ohio App.3d 168, 474 N.E.2d 1219 (2d Dist.1984).[1] (App't Br. At 5.) The court in *Goines* quoted the Iowa Supreme Court's holding:

---

[1] Attempting to boost the authority of *Goines*, White incorrectly states in his brief that this case, decided in 1984, utilized *Sitz*, the United States Supreme Court decision that was not decided until six years later, in 1990. (App't Br. At 5.) He further misstates in his brief that the four-prong test quoted in *Goines* was "recently outlined" in the Ohio Supreme Court's decision *State v. Orr*, although *Orr* did not mention the four-prong standard or the *Goines* opinion but rather, used the three-prong standard of *Sitz*, as discussed above. (*Id.*)

> Where there is no consent, probable cause, or *Terry*-type reasonable and articulable suspicion, a vehicle stop may be made only where there minimally exists (1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to "show * * * the police power of the community;" and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria.[2]

*Id.* at 170-171, quoting *State v. Hilleshiem*, 291 N.W.2d 314, 318 (Iowa 1980). Alleging that the fourth element of the above standard is not satisfied in the current case, White urges us to find the roadblock at issue unconstitutional.

{¶13} We recognize that some Ohio courts have used the four-prong analysis quoted in *Goines* to determine constitutionality of roadblocks or checkpoints. For example, the First Appellate District expressly adopted the four-prong test stating, albeit incorrectly, that it had been "adopted in Ohio by the Second Appellate District,"[3] and classifying it as "a more particular analysis to

---

[2] We note that the Second Appellate District in *Goines* did not expressly adopt the four-prong standard and did not analyze the case under the four elements dictated therein although it did quote the Iowa Supreme Court's standard. Indeed, the facts, as stated in the *Goines* opinion, did not support the elements of the four-prong test; yet, the appellate court affirmed the "designated checkpoint" in the case on the basis that "[p]rivacy interests of all citizens must at times be surrendered to reasonable demands of society, *e.g.,* public safety." *Goines*, 16 Ohio App.3d at 172, citing *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Therefore, this standard has not been "adopted" or "established," but merely quoted in *Goines*. Nevertheless, for ease of discussion, we will refer to the four-prong test throughout this opinion as the "*Goines* test."

[3] As explained in fn. 2, the Second Appellate District in *Goines* merely quoted and did not expressly adopt or apply the four-prong Iowa Supreme Court's standard from *Hilleshiem*. *See Goines*, 16 Ohio App.3d at 170-171, 172 (affirming the checkpoint in the case on the basis that "[p]rivacy interests of all citizens must at times be surrendered to reasonable demands of society, *e.g.,* public safety").

determine the constitutionality of sobriety checkpoints" than the three-part test established by the United States Supreme Court in *Sitz*. *State v. Williams*, 181 Ohio App.3d 472, 2009-Ohio-970, 909 N.E.2d 667, ¶ 18 (1st Dist.). *See also State v. Park*, 5th Dist. Licking No. 12-CA-25, 2012-Ohio-4069, ¶¶ 11-23; *State v. Hall*, 5th Dist. Ashland No. 03-COA-064, 2004-Ohio-3302, ¶¶ 18-25.

{¶14} Conversely, other Ohio courts recognized the four-prong test from *Goines* as an elaboration of the *Orr* test, or a useful tool for analyzing the intrusion element in the three-prong balancing test, without holding that a failure to satisfy the test is a constitutional violation. For example, the Tenth District Court of Appeals held that "[i]n measuring the potential subjective impact upon motorists of the checkpoint, we find useful the first three elements of the test set forth by the Iowa Supreme Court and relied upon in *Goines*." *State v. Bauer*, 99 Ohio App.3d 505, 512, 651 N.E.2d 46 (10th Dist.1994) (rejecting an idea that a checkpoint must be publicized with information including "all the specifics of the checkpoint locations and duration" in order to be constitutional). That district court also stated that the *Goines* test provided "*guideline*s for determining interference with personal liberties." (Emphasis added.) *State v. Nelson*, 10th Dist. Franklin No. 01AP-699, 2002 WL 356317, *3.

{¶15} Nevertheless, neither the United States Supreme Court nor the Ohio Supreme Court adopted a similar analysis although they addressed the issue of

constitutionality of roadblocks after *Goines* and *Hilleshiem*. Therefore, we hold that the proper test to be applied in this case is the three-prong case-by-case balancing standard established in *Orr* and *Sitz*. Hence, the trial court was required to evaluate the following three elements to determine whether the checkpoint established by the Ohio State Highway Patrol was constitutional: (1) the checkpoint's intrusion on privacy, (2) the state's interest in maintaining the checkpoint, and (3) the extent to which the checkpoint advanced the state interest. *Orr*, 91 Ohio St.3d 389, at syllabus, 392-393, citing *Sitz*, 496 U.S. 444. The trial court applied this balancing standard to the case at issue and found that "the stopping of an individual at the sobriety checkpoint in question constituted a minimal intrusion into the privacy of the individual"; "[t]he State's interest in maintaining such a checkpoint is * * * the safety of the motoring public by taking those persons operating vehicles under the influence of alcohol and/or drugs off the roadway [and it] is a very important interest"; and that "[t]he interests of the State of Ohio were met by this checkpoint."[4] (R. at 24, at 5.)

{¶16} Under the applicable standard, we must review de novo whether the three elements of the *Orr* balancing test weigh in favor of upholding the constitutionality of the roadblock at issue. White does not dispute the trial court's

---

[4] The trial court then recognized that the standard quoted in *Goines* had not been adopted in this appellate district. Yet, the trial court found the standard persuasive and therefore, analyzed the current case under the four-prong test as well, concluding that each of its elements was satisfied. (R. at 24, at 5-6.) Even though we do not find the trial court's analysis under *Goines* to be erroneous, we refuse to adopt the four-prong test in a way suggested by White, as a means of testing constitutionality of an OVI roadblock in Ohio.

conclusion as to the state's important interest in maintaining an OVI checkpoint and such interest has previously been found to satisfy the second prong of the *Orr/Sitz* analysis. *See Sitz*, 496 U.S. at 451; *Nelson*, 2002 WL 356317, at *3; *State v. Eggleston*, 109 Ohio App.3d 217, 224, 671 N.E.2d 1325 (2d Dist.1996). Therefore, we also hold that the first prong weighs in favor of the checkpoint's validity.

**{¶17}** Next, we address the third prong, which is the extent to which the checkpoint advances the state interest, "determined by the effectiveness of the roadblock." *Nelson*, 2002 WL 356317, at *3; *Orr*, 91 Ohio St.3d at 394. The trial court found that in support of this element was the fact that "more than just the defendant were shepherded to the holding area after showing signs of impairment for further testing in just a brief time that the defendant was being questioned and tested." (R. at 24, at 5.) This factual finding is supported by the record. (*See* State's Ex. B.) Furthermore, checkpoints as a "system" have been found to reasonably advance "the State's interest in preventing drunken driving." *Sitz*, 496 U.S. at 444-455 (recognizing expert testimony stating "that experience in other States demonstrated that, on the whole, sobriety checkpoints resulted in drunken driving arrests of around 1 percent of all motorists stopped"). Accordingly, the third prong of the *Orr* analysis weighs in favor of the roadblock.

**{¶18}** White's main contention seems to go to the second prong of the *Orr* test, the checkpoint's intrusion on privacy, since the issue addressed by the four-prong *Goines* test, and challenged by White, is the validity of the checkpoint procedures as they limit the checkpoint's intrusion on privacy. The United States Supreme Court in *Sitz* "did not establish precise limits to the length and procedure employed at an initial checkpoint stop." *Bauer*, 99 Ohio App.3d at 511. Neither did the Ohio Supreme Court in *Orr* adopt a precise standard for determining whether the checkpoint was procedurally proper, even though the *Goines* opinion and its four-prong standard predated *Orr*. Instead, the *Sitz* court evaluated the guidelines governing checkpoint operation that minimized the discretion of the officers on the scene, the brief duration of the stop, and the fact that uniformed police officers stopped every approaching vehicle. *Sitz*, 496 U.S. at 451-453. The court then concluded that the intrusion caused by the checkpoint was not unreasonable. *Id.* at 451-453; *see also Eggleston*, 109 Ohio App.3d at 226-227 ("When evaluating the lawfulness of the checkpoint, we are most concerned with the guidelines, duration, and intrusiveness of the initial stop. *Sitz, supra*."). The Ohio Supreme Court in *Orr* analyzed the specific procedures employed by the city of Dayton without reference to "a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria," as

would be required under *Goines* and as White would like us to apply. *See Orr*, 91 Ohio St.3d at 393. Therefore, rather than adopting a rigid standard for analyzing the intrusion on privacy in OVI roadblock cases, we will review the specific procedures used by the Ohio State Highway Patrol and weigh them against the state's interest in preventing operating a vehicle under the influence.

{¶19} The trial court made the following findings of fact regarding procedures employed by the Ohio State Highway Patrol at their roadblock:

> The Court would find from the credible testimony presented that an OVI check point was set up under the direction of the Ohio State Highway Patrol on March 16, 2012 on State Route 309, between Robb Avenue, and Cole Street in American Township, Allen County, Ohio. It was operational from 9:00 P.M. to midnight on that date. Officers from several agencies assisted in the running of such checkpoint, including Trooper Mathew Geer of the Findlay post. All were under the direction of Lieutenant Brant Zemelka, post commander of the Lima post.
>
> Lieutenant Zemelka, as post commander, requested permission from District Headquarters of the Ohio State Highway Patrol in Findlay, Ohio to conduct such an OVI checkpoint and was ultimately granted permission from, not only the District, but also the State headquarters in Columbus, Ohio. His reasoning for such request and his procedural outline for the checkpoint's operation were admitted as State's "Exhibit H". While part of that form was generated by the Lieutenant specifically for this particular checkpoint, much of the form was preprinted and generic in nature. It is the form used by the Ohio State Highway Patrol when seeking permission to run such an operation. It contained no statistical data regarding why the checkpoint was placed where it was placed but merely generalities concerning the heavy traffic pattern in the area, the traffic accidents in the area and arrests for OVI in the area.

Prior to the operation of the checkpoint, motorists and the general public were alerted that such an operation was to take place. By press releases to local media on March 12, 2012, March 14, 2012 and March 16, 2012 (State's "Exhibit I"), the checkpoint was announced for release to the public with the last one identifying State Route 309, along with the time. Albeit, the exact location on State Route 309 was not given, it is well known that said highway traverses almost the entire width of Allen County from east to west. The exact location where the checkpoint was set up is a heavily traveled roadway between Lima's city limit and the Lima Mall. Advanced warning signs alerting motorists of the OVI checkpoint were located at the intersections of State Route 309 and Robb Ave., affording those traveling eastbound to exit onto Robb Avenue and avoid the checkpoint, and State Route 309 and Cole Street, affording those traveling westbound the opportunity to turn onto that street, and, also, avoid the checkpoint. In either event, motorists were not required to enter the checkpoint area.

* * *

The checkpoint location, west of Cole Street and east of Robb Avenue, was easily visible to oncoming motorists and in a safe area, and that it is a straight stretch of road easily navigable to the motoring public. The area was extremely well lit and had adequate signage informing the public of what was taking place at access for them to avoid the area by turning onto either Cole Street, or Robb Avenue prior to entering the restricted zone. The numerous police cars and over a dozen officers from various departments could be seen easily by the public and showed a sufficient police power of the community.

Lt. Zemelka testified that the criteria used to select the checkpoint location included the fact that it was a high traffic area with a history of alcohol-related crashes and OVI arrests. * * * He also testified as to the procedure to be used on vehicles stopped within the checkpoint (State's "Exhibit H"). * * * On cross-examination, it was admitted that no statistics were submitted in the request to support the assertions made about the particular area of the alcohol checkpoint.

> * * * As was testified by Trooper Geer, the driver was approached and explained the purpose of the checkpoint, given a pamphlet on the dangers of operating a vehicle under the influence, and, if no odor of alcohol was detected or any other sign of impairment noted, the driver was sent on his or her way. Although no testimony was given as to the exact time of such stop, the Court can reasonably conclude that it was minimal.

(R. at 24, at 1-2, 4-5.)

{¶20} Accepting the trial court's unchallenged factual findings, which are supported by evidence in this case (*see, e.g.*, Tr. at 78-88), we hold that the procedures described above were reasonably sufficient to satisfy the constitutional protections against unreasonable searches and seizures. These procedures include all of the elements found sufficient by the Ohio Supreme Court in *Orr*: advance warning of the checkpoint's presence, "[v]isible signs of the officers' authority," "at least eleven officers, with police cruisers present," immediate advice of the purpose of the stop, brief duration of the stop, and an explanatory pamphlet given to the driver. *See Orr*, 91 Ohio St.3d at 393. We note that this particular checkpoint had additional elements, not noted by the *Orr* court: approval of the checkpoint by the district and state headquarters of the Ohio State Highway Patrol, press releases announcing the checkpoint ahead of time, and an opportunity to avoid the checkpoint area. Furthermore, a challenge very similar to the one White advances, based on allegedly insufficient data to support the roadblock's location, time, and procedures, was rejected by the Tenth District Court of Appeals, which

utilized the four prongs of the *Goines* test in *Nelson*, 2002 WL 356317, at *4. Therefore, we are inclined to hold that "[c]learly, [this checkpoint] constituted a very limited intrusion into travelers' privacy and sense of security." *See Orr*, 91 Ohio St.3d at 393.

**{¶21}** In sum, we hold that the trial court did not err when it determined that the OVI roadblock used to stop White was constitutional, because "the balance of the State's interest in preventing [operation of a vehicle while under the influence of alcohol], the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." *See Sitz*, 496 U.S. at 455.

**{¶22}** Based upon the foregoing, White's first assignment of error is overruled.

*2. Fifth Assignment of Error—Probable Cause to Arrest*

**{¶23}** We opt to take this assignment of error out of order as it has bearing on our resolution of the second assignment of error. White argues that the single "failed" field sobriety test was insufficient to create probable cause for his arrest and therefore, his arrest was unconstitutional. If White's arrest was in fact unconstitutional, all evidence derived from the arrest must be suppressed as illegally obtained. *See State v. Flanagan*, 4th Dist. No. 03CA11, 2003-Ohio-6512,

¶ 7, citing *State v. Daily*, 4th Dist. No. 97CA25, 1998 WL 18139, *2 (Jan. 15, 1998), *and Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**{¶24}** We begin by recognizing that the arrest at issue was conducted without a warrant and as such, it required Trooper Geer to have probable cause to believe that a criminal offense had been committed or was being committed by White. *See State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 66, citing *Gerstein v. Pugh*, 420 U.S. 103, 111-112, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). "In determining whether the police had probable cause to arrest an individual for [OVI], we must consider whether, at the moment of arrest, the police had information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence." *State v. Dillehay*, 3d Dist. Shelby No. 17-12-07, 2013-Ohio-327, ¶ 19, quoting *State v. Thompson,* 3d Dist. No. 14-04-34, 2005-Ohio-2053, ¶ 18; *State v. Homan,* 89 Ohio St.3d 421, 427, 732 N.E.2d 952 (2000), *superseded by statute on other grounds as stated in State v. Boczar,* 113 Ohio St.3d 148, 863 N.E.2d 155, 2007-Ohio-1251, ¶ 10. We will evaluate the existence of probable cause in this case under the totality of the circumstances approach. *Id.*, citing *State v. Cromes*, 3d Dist. Shelby No. 17-06-07, 2006-Ohio-6924, ¶ 38. Under this approach, an arresting officer may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative

information available to them that 'might well elude an untrained person.' " *Cromes*, 2006-Ohio-6924, at ¶ 38, quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), *and United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶25} Trooper Geer testified that he was a certified peace officer who had worked for the Highway Patrol in traffic enforcement for over six years. (Tr. at 3, 5.) He had been trained in investigation and detection of operating under the influence offenses and had participated in arrests for impaired drivers between 800 to 1000 times. (Tr. at 4-5, 10-12.) The trial court found credible Trooper Geer's testimony that there was "a strong odor of alcoholic beverage emanating from inside [White's] vehicle," as well as his observation that White had "flushed face, bloodshot eyes, and somewhat slurred speech." (R. at 24, at 2.) The trial court considered Geer's testimony that he had observed "a 'strong' odor of alcoholic beverage coming from the defendant's breath, even after separating him from the vehicle and its two other passengers." (*Id.* at 6.) The trial court acknowledged White's admission that he had consumed three beers prior to driving, but it also recognized that White did not demonstrate " 'bad' driving." (*Id.* at 2, 6.)

{¶26} With respect to the field sobriety tests, Geer testified that during the

administration of the Horizontal Gaze Nystagmus (HGN)[5] test he had observed White's eyes still being bloodshot and glassy. (Tr. at 16.) He further observed a positive result on six out of six clues present in the test, which included a lack of smooth pursuit, nystagmus at maximum deviation, and onset nystagmus prior to forty-five degrees. (Tr. at 15-17.) Geer stated that, based on his training and experience, the more of the above described clues that are observed during the administration of the test, the more the subject had to drink. (*Id.* at 17.) Geer testified that he had never seen anyone test below the legal limit on alcohol content after exhibiting six out of six clues. (*Id.*) The trial court excluded the results of the HGN test for failure to substantially comply with National Highway Traffic Safety Administration (NHTSA) standards.

{¶27} The trial court admitted "the heel-to-toe test," and concluded that White "flunked" it because he started it "prior to being instructed to do so, he moved his feet to maintain balance during the instructional phase and * * * he

---

[5] For the purpose of this opinion we find it necessary to quote the explanation of the HGN test, provided in *State v. Homan*, 89 Ohio St.3d 421, 422, 732 N.E.2d 952 (2000), fn. 1:

> The HGN test is one of several field sobriety tests used by police officers in detecting whether a driver is intoxicated. "Nystagmus" is an involuntary jerking of the eyeball. "Horizontal gaze nystagmus" refers to a jerking of the eyes as they gaze to one side. The position of the eye as it gazes to one side is called "maximum deviation." In administering the test, an officer takes some object, a pen for example, and places it approximately twelve to fifteen inches in front of the suspect's nose. The officer then observes the suspect's eyes as they follow the object to determine at what angle nystagmus occurs. The more intoxicated a person becomes, the less the eyes have to move toward to the side before nystagmus begins. Cohen & Green, Apprehending and Prosecuting the Drunk Driver: A Manual for Police and Prosecution (1997), Section 4.04 [2][a]. Other signs of intoxication include distinct nystagmus at maximum deviation and the inability of the suspect's eyes to smoothly follow the object. See 1 Erwin, Defense of Drunk Driving Cases (3 Ed.1997), Sections 10.04[5] and 10.06[1].

failed to touch heel to toe on six of these steps going forward and back." (R. at 24, at 2.) The trial court also admitted "the one-leg stand test," concluding that White "did not flunk [it] under NHTSA standards" although he "put his foot down one time at approximately count 23, and * * * swayed for balance while taking the test."[6] (*Id.*) Because of the trial court's exclusion of the HGN test and its finding that White did not "flunk" the one-leg stand test, White now argues that the trial court's finding of probable cause was based on one "failed" field sobriety test only.

{¶28} We have previously held that factors that may be taken into account in probable cause determination are not limited to the field sobriety tests:

> While field sobriety tests must be administered in strict compliance[7] with standardized procedures, probable cause to arrest does not necessarily have to be based, in whole or in part, upon a suspect's poor performance on one or more of these tests. The totality of the facts and circumstances can support a finding of probable cause to arrest even where no field sobriety tests were administered or where, as here, the test results must be excluded for lack of strict compliance.

*State v. Ferguson*, 3d Dist. Defiance No. 4-01-34, 2002 WL 596115, *3, citing *Homan,* 89 Ohio St.3d at 427. Furthermore, even when the test *results* are excluded, the testimony about the defendant's performance during the

---

[6] Although the trial court used the term "flunk" when referring to the field sobriety tests, we recognize that the field sobriety tests are not "passed" or "failed" but rather, they are considered by the number of clues that are exhibited by the suspect.

[7] Although the above quote uses "strict compliance," later cases clarified that strict compliance is no longer required and substantial compliance with the testing procedures is sufficient. *See State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986), syllabus.

administration of the excluded tests is admissible for the purpose of determining probable cause under the totality of the circumstances approach:

> We see no reason to treat an officer's testimony regarding the defendant's performance on a nonscientific field sobriety test any differently from his testimony addressing other indicia of intoxication, such as slurred speech, bloodshot eyes, and odor of alcohol. In all of these cases, the officer is testifying about his perceptions of the witness, and such testimony helps resolve the issue of whether the defendant was driving while intoxicated.
>
> Unlike the actual test results, which may be tainted, the officer's testimony is based upon his or her firsthand observation of the defendant's conduct and appearance.

*State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, 801 N.E.2d 446, ¶¶ 14-15; *State v. Griffin*, 12th Dist. Butler No. CA2005-05-118, 2006-Ohio-2399, ¶ 11 ("Regardless of a challenge to field sobriety tests, a police officer may testify regarding his observations made during administration of the tests."). Therefore, Trooper Geer's observations about all administered field sobriety tests, "the failed one", "the passed one,"[8] and the excluded one, are admissible for the purpose of determining whether the trial court erred when it found there was probable cause to arrest White on March 16, 2012.

{¶29} Under the totality of the circumstances we cannot conclude that the trial court erred in its finding that it was reasonable for Trooper Geer to believe that White was under the influence of alcohol, based on his experience and

---

[8] *See* fn. 6, *supra*, regarding the terminology applicable to the field sobriety tests.

specialized training. At the moment of the arrest, Trooper Geer had reasonably trustworthy information indicating that White had had three beers prior to driving. He observed White's flushed face, bloodshot eyes, and slurred speech, as well as an odor of alcoholic beverage coming from his breath. In addition to exhibiting a number of clues during one field sobriety test, White swayed for balance and put his foot down during the one-leg stand test. All these cumulative clues could sufficiently cause a prudent person to believe that White was operating a vehicle under the influence.

{¶30} Accordingly, White's fifth assignment of error is overruled.

*3. Second Assignment of Error—Consent to Take the Breath Test and Coercion*

{¶31} In the second assignment of error, White contends that his consent to the breath test was a product of coercion because "the clear meaning of the officers [sic] words were [sic] that further cooperation would prevent appellant from being jailed and the immediate request after that coercive language was to request a breath test."[9] (App't Br. at vi.) White takes issue with a few of the statements made by Trooper Geer during the stop. In particular, after informing White that he was being placed under arrest for OVI, Trooper Geer stated, "As

---

[9] We note that the record shows that the request for a breath test was not made immediately after the statements regarding cooperation. *See* State's Ex. B; Tr. at 24, 36 (testifying that the request to submit to the breath test was made in the command center vehicle, while the statements regarding cooperation were made prior to going to the command center, when White was still in the police cruiser).

long as you remain cool and cooperative with me you are going to go home tonight * * * I'll just issue you a ticket and I'll not have to take you to jail." (Tr. at 36.) White asserts that these statements were coercive and that his consent to the breath test, given later that night,[10] was the result of these allegedly coercive statements. Of note, at no point in these proceedings has White alleged or proved that he actually felt coerced or felt that his free will was overborne. He seems to rely on the assumption that Trooper Geer's statements were coercive on their face, and on Geer's admission, on cross-examination, that he "could see" "someone believing that they needed to take the breath test or they're going to jail," even though he did not mean it that way. (Tr. at 37-38.)

{¶32} A chemical test, such as a breath test, is a search under the Fourth Amendment to the United States Constitution. *See Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *State v. Groszewski*, 183 Ohio App.3d 718, 2009-Ohio-4062, 918 N.E.2d 547 (6th Dist.), citing *Schmerber*; *Burnett v. Municipality of Anchorage*, 806 F.2d 1447, 1449 (9th Cir.1986). A warrantless search is per se unreasonable unless certain "specifically established and well delineated exceptions" exist. *City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz v. United States*, 389

---

[10] *See* fn. 9.

-23-

U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The burden is on the state to establish that a warrantless search is valid under one of those exceptions. *Id.*

**{¶33}** In this case, the exception at issue is consent. Under the implied consent statute in Ohio, the State's burden is satisfied because

> [a]ny person who operates a vehicle * * * upon a highway * * * shall be deemed to have given consent to a chemical test or tests of the person's whole blood, blood serum or plasma, breath, or urine to determine the alcohol * * * content of the person's whole blood, blood serum or plasma, breath, or urine if arrested for [operating a vehicle under the influence].

R.C. 4511.191; *State v. Turner*, 11th Dist. Portage No. 2007-P-0090, 2008-Ohio-3898, ¶ 44 (holding that under R.C. 4511.191 "an OVI suspect is already deemed to have consented to the breath test").

**{¶34}** White first contends that the implied consent statute does not apply "unless the Defendant was validly arrested by an officer having reasonable grounds to believe the Defendant was operating a vehicle while under the influence of alcohol and/or drugs of abuse and was properly advised of the Ohio Implied Consent Provisions." (App't Br. at 10.) As we have already established in our analysis of the fifth assignment of error, White was validly arrested. Further, the trial court found that White was read the BMV 2255 form, which explained his right to request his own chemical test and advised him of the consequences of taking or refusing to take the test. (R. at 24, at 3; Tr. State's Ex. C (including White's acknowledgment of the form having been read to him).)

This factual finding is supported by the record and therefore, the implied consent statute, R.C. 4511.191, applies in this case.

{¶35} White next contends that the implied consent warnings in this case were misstatements of law and therefore, they resulted in the consent being involuntary and thus, evidence of breath alcohol content was unconstitutionally obtained. (App't Br. at 10.) There is no evidence to support an allegation that the implied consent warnings, as read from BMV Form 2255, were read improperly or misstated. In addition to Trooper Geer's testimony regarding the reading of the form, White and a witness signed an acknowledgment that the advice was shown and read to White. (Tr. State's Ex. C and D.)

{¶36} White attempts to argue, however, that Trooper Geer's statements constituted warnings related to the implied consent and they were misstatements of law because they indicated that refusal to take the breath test is an arrestable offense. White's argument is misplaced because there is no reason to treat Trooper Geer's statements as implied consent warnings where actual warnings were properly given in accordance with the statute. *See* R.C. 4511.192(B) (prescribing the language contained in BMV Form 2255). Furthermore, there is no link between those statements and the later request for breath test. Trooper Geer merely asked White for cooperation and denied indicating that the lack of corporation or refusal to take the breath test would result in an arrest. (*See* Tr. at

37-38.) Thus, White's argument that these comments implied that he would be imprisoned if he did not take the breath test is based on a number of much attenuated inferences, unsupported by any evidence in the record. Trooper Geer made no misstatements of law as they relate to the implied consent warnings.

**{¶37}** Moreover, the argument fails because

> arguments that an officer's misinformation or other statements coerced a suspect's consent to submit to a chemical test have been consistently rejected by courts of appeal. See e.g. *Columbus v. Dixon,* 10th Dist. No. 07AP-536, 2008-Ohio-2018, at ¶ 7 ("despite the fact that the police officers informed appellant that if she refused the test she would be held in custody for 12 to 24 hours, we find that the officers did not coerce appellant into taking the Breathalyzer test"); *Wickliffe v. Hromulak,* 11th Dist. No.2000-L-069, 2001 Ohio App. LEXIS 1835, at *13 ("[t]he fact that appellant * * * failed to recognize that he would be subject to penalties beyond the ninety-day administrative suspension * * * does not call into question the validity of his consent in submitting to the BAC test"); *State v. Tino,* 1st Dist Nos. C-960393, C960394, and C-960395, 1997 Ohio App. LEXIS 747, at *6 ("[t]he results of the [chemical] test * * * were admissible in the disposition of appellant's criminal case regardless of whether the ALS provisions were properly communicated").

*State v. Morgan*, 11th Dist. Portage No. 2008-P-0098, 2009-Ohio-2795, ¶ 67; *see also State v. Eaton*, 3d Dist. Auglaize No. 2-10-10, 2010-Ohio-6065, ¶ 15-17, fn. 2 (citing the above authorities and rejecting an argument that an officer's "misstatement regarding the per se blood-alcohol limit for commercial drivers" rendered "involuntary" the defendant's refusal to submit to a chemical test).

**{¶38}** Since there were no irregularities in either White's arrest or the implied consent warnings read to him, the implied consent was valid and the State

was not required to demonstrate "by 'clear and positive' evidence that consent was freely and voluntarily given," as White contends. (App't Br. at 8.)

**{¶39}** Nevertheless, the trial court addressed White's argument regarding the consent being improperly coerced and determined that the consent was not a result of coercion. (R. at 24, at 3, 9.) "The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 99, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The State established by unopposed testimony of Trooper Geer that White was asked to submit to a breath test. (*See* Tr. at 24, 26.) Trooper Geer testified that White "considered whether or not to take the test for a period of time before consenting to take it." (R. at 24, at 9.) There was no testimony to contradict the State's version of events and no evidence that White felt coerced. Looking at all the circumstances, the trial court found that White consented and that the test was taken voluntarily. (R. at 24, at 3, 9.) We hold that, under the totality of the circumstances, the record supports the trial court's conclusion.

**{¶40}** Based upon the foregoing discussion, White's second assignment of error is overruled.

*4. Third Assignment of Error—Twenty-Minute Wait Period Prior to Breath Test*

**{¶41}** The third assignment of error challenges the admissibility of the breath test results due to an alleged failure to comply with the prescribed procedural requirement of the twenty-minute observation period prior to testing. This challenge is based on the regulation that breath samples "shall be analyzed according to the operational checklist for the instrument being used." Ohio Adm.Code 3701-53-02(D); R.C. 4511.19(D)(1). It has been recognized that one of the elements on the checklist is "that the person being tested be observed for twenty minutes before the test to prevent the oral intake of any material." *State v. Siegel*, 138 Ohio App.3d 562, 566-567, 741 N.E.2d 938 (3d Dist.). This requirement operates "to eliminate the possibility that the test result is a product of anything other than the subject's deep lung breath." *State v. McAuley*, 8th Dist. Cuyahoga No. 76720, 2000 WL 1038186, *4 (July 27, 2000); *accord State v. Steele*, 52 Ohio St.2d 187, 191, 370 N.E.2d 740 (1977); *State v. Camden*, 7th Dist. Monroe No. 04 MO 12, 2005-Ohio-2718, ¶ 13, quoting *Bolivar v. Dick,* 76 Ohio St.3d 216, 218, 667 N.E.2d 18 (1996). Strict compliance with the twenty-minute observation period is not required, however, as the courts require substantial compliance. *See Bolivar*, 76 Ohio St.3d at 218; *Camden*, 2005-Ohio-2718, at ¶ 14; *McAuley*, 2000 WL 1038186, at *4; *State v. Holly*, 135 Ohio App.3d 512, 515, 734 N.E.2d 869 (12th Dist.1999).

{¶42} The trial court made the following factual findings relevant to this assignment of error:

> At the checkpoint diversion area, there was a "command center" trailer wherein a portable Intoxilyzer 8000 breath-testing machine was located. This allowed the arresting officers to give a BAC test on scene without transporting defendants to the Ohio Highway Patrol post. From the time stamp of the video, the Court would find that the defendant was under surveillance from 10:14 P.M. until the test was begun at 10:47 P.M. with the exception of a total of approximately 55 seconds when Trooper Geer exited the command center to briefly speak with another trooper. When the defendant was inside the patrol car prior to going to the command center, the trooper was just outside and able to keep the defendant in view through the windshield and side windows. There is no evidence that defendant ingested anything during any time that the troopers were not physically with him.

(R. at 24, at 3.)

> The first attempt to give the defendant a breath test was begun at 10:41 P .M.[11] but was terminated one minute later when an interference was detected, which automatically shut down the machine (Defendant's "Exhibit l").[12]
>
> Thereafter, a second test was begun at 10:43 P.M. that was completed at 10:54 P.M..

(*Id.*)

> In the instant case, defendant was placed in the patrol vehicle and then the command center of the alcohol checkpoint, where the Intoxilyzer 8000 was located. The video, by use of the time stamp thereon, shows that he was out of direct observation by Trooper

---

[11] Although this finding is not challenged here, we note that Trooper Geer testified that the first test was started at 10:37 p.m., but the first air blank was blown at 10:41 p.m. (Tr. at 45; *see also* R. at 22, Def.'s Proposed Findings of Facts and Conclusions of Law, Ex. 1.)

[12] It appears that the trial court refers to an exhibit that was attached to R. at 22, Def.'s Proposed Findings of Facts and Conclusions of Law, as there is no "Defendant's 'Exhibit 1'" attached to the Transcript.

Geer for 52 seconds of the [20-minute] period he was to be watched prior to the test being administered. While in the cruiser, defendant is not on camera, but he was on camera while in the command center and he could not be seen to put anything in his mouth during that period. As to the period of time in the cruiser, there was no evidence submitted that would lead a reasonable person to believe that he had ingested anything that would have affected the test. The Court would find that the defendant was personally observed for 95.67% of the time required by the rule and no evidence was submitted giving any indication that during the time he was not personally observed that he did ingest anything that would have affected the test. Therefore, the Court would conclude that the State of Ohio, substantially complied with the requirement of the administrative rule concerning the 20-minute observation period in this particular case.

(*Id.* at 10.)

In the instant case, the defendant was stopped at the sobriety checkpoint at 10:14 P.M. on March 16, 2012. The Intoxilyzer 8000 (OH-5) breath test was administered at 10:43 P.M. * * *.

(*Id.* at 11.)

In this particular test, Trooper Geer followed the operational checklist as shown on the machine's screen. It ran an air blank showing clear and performed its diagnostic check and a second air blank run at 10:47 P.M. on March 16, 2012, and then performed a dry gas control test within standard. It then ran an air blank test showing clear and the defendant's sample of breath gave a BAC result of .120 at 10:49 P.M .. Two more air blanks were run showing the machine clear of any residual alcohol and a second sample of the defendant's breath was given at 10:53 P.M., showing a BAC result of .120. The machine again cleared itself of any residual alcohol and a second dry gas control was run showing it to be within standard at 10:54 P.M .. The machine then cleared itself again, of residual alcohol and the test was concluded.

(*Id.* at 12.)

{¶43} We first note that there seems to be some discrepancy in the above quoted sections of the trial court's findings with respect to the time that the breath tests were administered. After reviewing the evidence, we clarify that according to the first Subject Test Report, although the administration of the first test began at 10:37:25 p.m., the first air blank was blown at 10:41 p.m. and the second air blank was blown at 10:42 p.m. (*See* R. at 22, Def.'s Proposed Findings of Facts and Conclusions of Law, Ex. 1; *see also* Tr. at 45.) This Report is marked with words "Interferent Detect." (*Id.*) The second Subject Test Report offered in evidence shows that the administration of the second test was begun at 10:43 p.m., the first air blank was blown at 10:47 p.m., the first subject sample was received at 10:49 p.m., and the second subject sample was received at 10:53 p.m. (State's Ex. F.) This test was concluded with a dry gas control and an air blank at 10:54 p.m. (*Id.*) Therefore, we recognize that although the administration of the second test began at 10:43 p.m., White did not actually start performing this test until 10:47 p.m. Therefore, the trial court's finding on page 3 of the Judgment Entry, that "the test was begun at 10:47 P.M." is correct and is supported by the record.

{¶44} White challenges the trial court's finding that the break in the observation period was only about fifty seconds. (App't Br. at 13.) In this respect, the trial court found that the break in the observation period occurred after White had been placed in the command center, "when Trooper Geer exited the

command center to briefly speak with another trooper," which the video evidence shows to be after 10:30 PM. (R. at 24, at 3; State's Ex. B.) The trial court found that White "was on camera while in the command center and he could not be seen to put anything in his mouth during that period." (R. at 24, at 10.) This finding is not challenged on appeal. White asserts, however, that there was a separate three-minute period when he was not observed, immediately after being placed in the police cruiser, between 10:25:30 p.m. and 10:28:30 p.m. (App't Br. at 13.)

{¶45} The record includes a video from a camera that was installed in the police cruiser in which White was kept prior to being moved to the command center. (State's Ex. B.) After reviewing the video evidence, we recognize that Trooper Geer left the vehicle's immediate vicinity at 10:25:34 p.m. and he can be seen returning at 10:27:26 p.m., which is less than two minutes later. (*Id.*; *see also* Tr. at 34-35.) During that time, Trooper Geer can be seen leaning into another car and talking on the phone, but there are also moments when he is out of the camera's reach. (*Id.*) Although we cannot say that White was out of Trooper Geer's sight for the entire two minutes, it is clear that there were moments when Trooper Geer was not watching him. Furthermore, Trooper Geer admitted that he did not personally monitor White all the time. (Tr. at 34, 41.) Therefore, the trial court's finding on page 3, stating that "[w]hen the defendant was inside the patrol car prior to going to the command center, the trooper was just outside and able to

keep the defendant in view through the windshield and side windows," is not supported by the record.

**{¶46}** Nevertheless, even if we accept White's suggestion that the two-minute interruption in observation mandated a "restart in the required 20 minute observation period," there was at least nineteen and a half minutes of monitoring from 10:27:26 p.m., when Trooper Geer returned, until 10:47 p.m. when the first air blank was blown, and at least twenty-one and a half minutes until the first breath sample was received at 10:49 p.m. Therefore, the State substantially complied with the requirement of a twenty-minute observation when it proved that White was watched between 10:27:26 p.m. and 10:49 p.m.

**{¶47}** White next argues that a separate twenty-minute observation period was required after the first attempt to administer the test detected interference. Similar suggestions have been consistently rejected by the courts in Ohio. *See State v. Householder*, 181 Ohio App.3d 269, 2009-Ohio-826, 908 N.E.2d 987, ¶¶ 11, 22 (5th Dist.) (citing decisions by other Ohio courts that rejected a suggestion that the observation period restarts after an invalid sample); *State v. Reiger*, 5th Dist. Fairfield No. 02CA30, 2002-Ohio-6673, ¶¶ 8-16; *State v. Gigliotti*, 6th Dist. Erie No. E-99-081, 2000 WL 1867265, *6 (Dec. 22, 2000) (holding that a memorandum from the Ohio Department of Health that required the observation period to be restarted after an invalid sample did not constitute a regulation and

was not enforceable); *State v. Bosier*, 12th Dist. Clinton No. CA99-11-036, 2000 WL 1050976, *2 (July 24, 2000); *City of Rocky River v. Papandreas*, 8th Dist. Cuyahoga No. 76132, 2000 WL 301080 (Mar. 23, 2000); *McAuley*, 2000 WL 1038186, at *5, quoting *Papandreas, id.* (holding that where the evidence demonstrated that the defendant did not ingest anything between the first and subsequent testings, "the police 'had no reason to wait another twenty minutes before administering the breath test.' "); *State v. Matlack*, 4th Dist. Athens No. 95CA1658, 1995 WL 646355, *4 (Nov. 2, 1995). Following our sister districts, we reject White's contention that a new twenty-minute observation period was required after the breathalyzer displayed the message "Interferent Detect."

{¶48} Therefore, we hold that the State substantially complied with the Ohio Department of Health regulations and, lacking any prejudice shown or alleged by White, the breath test results are admissible. *See State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986), syllabus; *Holly*, 135 Ohio App.3d at 515, citing *Plummer id.* ("Once the prosecution demonstrates substantial compliance, the defendant must show that he would be prejudiced by failure to strictly comply with the regulations. If the defendant is unable to show prejudice, then the results of the breath-test are admissible.").

{¶49} Accordingly, White's third assignment of error is overruled.

*5. Fourth Assignment of Error—Administration of the Breath Test with the Use of the Allegedly Expired Dry Gas*

**{¶50}** The final point we need to address is White's assertion that his breath test was improperly administered because the dry gas used in "the wet bath certification," in the certification of the breath testing device, and in his test was expired. In support of his contention that the dry gas was expired, White points out that there are two expiration dates on one of the pages in State's Exhibit G, "Instrument Certification Report, Certificate of Analysis EBS - Ethanol Breath Standard." He argues that the ambiguity regarding the expiration dates should have been resolved in his favor and, as a result, the trial court should have held that his breath test was not properly administered.

**{¶51}** The trial court reviewed all the requirements of the administrative rules promulgated by the Ohio Director of Health, including rules related to certifications and testing of the dry gas and the instrument. (R. at 24, at 11.) After reciting the standards, the trial court found that the machine used in White's test, Intoxilyzer 8000, "was tested on December 28, 2011 by Robert Norbeck, the Director of Alcohol and Drug Testing's field representative for such matters." (*Id.* at 3.) The trial court further found that there were no irregularities with the machine, the "dry gas" or the "wet bath solution;" and that "the chemical test administered on the defendant was analyzed in accordance with methods approved by the director of health." (*Id.* at 3, 11, 12.) Hence, the trial court concluded that

-35-

the Intoxilyzer 8000 used in this test "was working properly when the test was administered" and that "the defendant's breath was analyzed according to the requirements of Ohio Administrative Code Chapter 3701-53-02(E) and admissible by the State of Ohio."  (*Id.* at 12.)

{¶52} We acknowledge that there are multiple dates on the dry gas certification page in the report at issue.  There is a printed phrase, "Product Expiration: 26 May 2014" and, several lines below, there is a handwritten note, "Adam S.  Kelly 6/28/2011 expires 11/14/2011."    (State's Ex. G.)  There is no link between the product expiration date and the handwritten note by Adam S. Kelly.  The person who prepared the Instrument Certification Report, Robert Norbeck, testified that he did not know who Adam Kelly was.  (Tr. at 67.)  Norbeck attested that the expiration date for the dry gas was May 26, 2014, and that the Intoxilyzer at issue was properly certified.  (Tr. at 60, 63, 65-66.)  White did not proffer any evidence to contradict this testimony or the clear meaning of the phrase on the dry gas certification, which stated that the dry gas expired on May 26, 2014.

{¶53} Therefore, we cannot conclude that the note, possibly made by Mr. Kelly, referred to the dry gas expiration date, rather than Mr. Kelly's commission expiration date, anything else's expiration, or whether it was merely a note put there in error by one Adam S. Kelly.  There is no explanation for why the

handwritten note appears on the document, but the trial court relied on the uncontradicted expert testimony and the documents in evidence in determining that there were no issues with the dry gas, the wet bath certification, or the instrument certification.

{¶54} There is no evidence to contradict the trial court's factual finding that the Intoxilyzer was working properly in all respects, that there were no issues with the dry gas used, and that White's breath test was administered properly. We thus defer to the trial court's "evaluation of evidence and the credibility of witnesses" because it is supported by competent and credible evidence. *See Mills*, 62 Ohio St.3d at 366; *Burnside*, 2003-Ohio-5372, ¶ 8; *Norman*, 136 Ohio App.3d at 51.

{¶55} As a result, the State has satisfied its burden of showing that the breath test was administered in substantial compliance with the administrative regulations and the trial court did not err in finding that the breath test was properly administered and admissible. *See Plummer*, 22 Ohio St.3d 292, at syllabus; *Defiance v. Kretz*, 60 Ohio St.3d 1, 3, 573 N.E.2d 32 (1991) (holding that "admissibility of test results to establish alcoholic concentration under R.C. 4511.19 turns on substantial compliance with ODH regulations").

{¶56} For the foregoing reasons, White's fourth assignment of error is overruled.

*Conclusion*

**{¶57}** Having found no error prejudicial to Appellant, in the particulars assigned and argued, we affirm the judgment of the Lima Municipal Court.

***Judgment Affirmed***

**ROGERS, J., concurs, concurs in Judgment Only**
     **as to Assignment of Error I**
**PRESTON, J., concurs.**
**/jlr**